BLUE CROSS & BLUE SHIELD UNIT-
ED OF WISCONSIN and Compcare
Health Services Insurance Corporation,
Plaintiffs,

v.

The MARSHFIELD CLINIC and Security
Health Plan of Wisconsin, Inc.,
Defendants.

No. 94–C–137–S.

United States District Court,
W.D. Wisconsin.

Oct. 27, 1994.

James R. Troupis, Michael, Best & Friedrich, Madison, WI, for Blue Cross & Blue Shield United of Wisconsin, Compcare Health Services Ins. Corp.

Steven J. Caulum, Bell, Metzner, Gierhart & Moore, Madison, WI, for Marshfield Clinic, and Security Health Plan of Wisconsin, Inc.

## MEMORANDUM AND ORDER

SHABAZ, District Judge.

Plaintiffs Blue Cross & Blue Shield United of Wisconsin ("Blue Cross") and Compcare Health Services Insurance Corporation ("Compcare") commenced this action against defendants The Marshfield Clinic ("Marshfield") and Security Health Plan of Wisconsin, Inc. ("Security") for damages, injunctive and declaratory relief. In their complaint plaintiffs allege defendants violated the Sherman Antitrust Act; the Wisconsin antitrust statute, section 133.03(2), and the illegal contracts section of the Wisconsin statutes, section 133.14.

Jurisdiction exists pursuant to 15 U.S.C. § 4 and 28 U.S.C. §§ 1331 and 1337. The action is before this Court on defendants' motion for summary judgment.

### FACTS

All factual disputes have been resolved in favor of the nonmoving party. Blue Cross is a Wisconsin service insurance corporation. It sells indemnity insurance to employers and individuals and pays for services rendered by the Marshfield Clinic on behalf of its insureds. Compcare is a health maintenance organization ("HMO") organized under the Wisconsin statutes. Marshfield is a physician-owned clinic in the State of Wisconsin. According to one source Marshfield employs every physician in eight municipalities and one entire county and two thirds of all physicians in a 10 county region. Security is a Wisconsin HMO wholly owned by Marshfield.

Blue Cross asserts that it acts as a knowledgeable purchaser of physician services for its customers and for self-insured employers who contract with Blue Cross for administrative services. Once Blue Cross expects to obtain indemnity insurance customers in a particular area, it approaches providers of physician services in order to negotiate rates and arrange for payments. Marshfield has negotiated or entered into a course of dealing with Blue Cross to accept payments directly from Blue Cross for services rendered by Marshfield and its physicians. For the past six years Blue Cross has directly paid[1] Marshfield for physician services provided by Marshfield doctors. Blue Cross and Marshfield use electronic transfer for billing and payment. Blue Cross has paid to Marshfield between $3.2 million and $6.5 million annually since 1988 for which it has never rejected a payment because Blue Cross was the source of the funds rather than the patient. However, Blue Cross does not have a written contract with Marshfield to purchase physician services.

Marshfield's indemnity insured patients sign a standard Authorization to Release and Assign Benefits form which authorizes Marshfield to disclose to the patient's insurance company information relating to his or her treatment, assigns to Marshfield any insurance benefits and by which he or she agrees to be responsible for services not paid in whole or in part by the patient's insurance company.

Marshfield has negotiated prices, individual account settlements and overall administrative matters directly with Blue Cross and others. Agreements have been reached between Blue Cross and Marshfield on matters including: individual authorization for treatment; administrative issues relating to the payment of millions of dollars of Marshfield charges; creation of computer links; those procedures eligible for payment; and manner by which procedures should be coded. Specific claims for amounts due in excess of those Blue Cross would pay are sometimes discussed between employees of Marshfield

---

1. Defendants have continuously objected to the use of the term "pay" in its various forms on the theory that Blue Cross is not a purchaser of physician services and argue for use of the term "remit". This is a distinction without a difference in both common usage and case law. Accordingly, their objection is denied.

and Blue Cross. Blue Cross has certain obligations to cover and defend Blue Cross insured patients from actions by the Marshfield Clinic. Marshfield Clinic has never required Blue Cross to involve a patient in meetings concerning a patient's account. Marshfield's rate nearly always crowds or exceeds the 90th percentile for UCR (usual, customary, and reasonable charge.) Blue Cross policies normally obligate Blue Cross to pay only the UCR for a given charge. Blue Cross has paid Marshfield charges that exceed the UCR rate. Blue Cross has paid disputed amounts and Marshfield has accepted those payments. Fee negotiations between Marshfield and Blue Cross have resulted in actual payment being made and balances forgiven by the Clinic.

Plaintiffs assert that health insurers are directly affected by and attempt to minimize the overall cost of physician services. Marshfield's actions directly affect Blue Cross by causing it to pay allegedly excessive fees. If an element of a paid claim reflects high prices, then the return of the indemnity insurer is diminished by the amount of that excess fee or price, whether such diminution occurs in the form of loss or lesser gross profit. It is disputed as to the extent if any this may be passed on to the insured. In addition, when physician fees increase for any reason, the UCR rate structure for similar physician services is impacted. The UCR system is driven by periodic calculations for charges within particular CPT codes. As revised increased fees are included, the UCR system will automatically readjust upward to continue to capture 90 percent of the charges. Charges by a large provider, such as the Marshfield Clinic, can cause an upward adjustment in the UCR approved charges and will impact the cost to Blue Cross of payment of physician fees throughout the State of Wisconsin. A UCR rate or fee is not meant to represent a "competitive" rate or fee. Marshfield's rate nearly always crowds or exceeds the 90th percentile for UCR.

Compcare has paid Marshfield for physician services incurred on behalf of its subscribers on an "out-of-area" basis which occurs when a Compcare subscriber requires emergency care and goes to a non-affiliated provider, in this case Marshfield Clinic.

While defendants have not monopolized any relevant health care financing product market, plaintiffs allege that they have dominated the HMO services market. While defendants allege that Security only insures 20% of the population in its service area, plaintiffs allege that Security insures a very large percentage of the HMO market. There are a variety of mechanisms for financing the provision of health care, including traditional indemnity insurance, participating provider networks, preferred provider organizations ("PPOs"), traditional health maintenance organizations ("HMOs"), "open-ended" or "point-of-service" ("POS") HMOs, and various forms of self-insurance. These products constitute the health services financing market and share one or more common features. However, plaintiffs allege that there is an HMO submarket because HMOs have peculiar characteristics and uses. Among these characteristics are distinct cost advantages that are confirmed by market data, management of care through utilization controls and prevention oriented steps and sharing of risk among providers, through capitation, withhold, or otherwise marketed by lower pricing and means.

Plaintiffs allege that a panel of Marshfield physicians is necessary to form an HMO to compete with Security and that Marshfield has denied them such access. Marshfield wholly owns Security HMO. Virtually every aspect of Security is under the direct control of Marshfield's physicians. As noted above, Marshfield employs a majority of physicians in its service area. Plaintiffs allege that there are insufficient physicians in certain geographic areas and insufficient physicians in certain specialties to form a competing HMO. Moreover, plaintiffs allege that because of Marshfield's monopoly there are barriers to market entry by bringing in new physicians. Marshfield did not offer Compcare any of its physicians on any basis except full fee payment until after receiving a copy of a draft Complaint. In a competitive environment where adequate physician provider panels are available to HMOs, the success of an HMO is judged in significant part by its

managed care controls over usage and costs, including physician and other fees. In fiscal year 1993 and for the current fiscal year as of April 3, 1994, Security's practice resulted in an even greater return to Marshfield than fee for service payments such as traditional indemnity insurance. Competitive HMO pricing is driven by the contracts the HMOs are able to execute with providers. The contracts sometimes take the form of a capitation arrangement. They may also take the form of a withhold, plus either a fixed fee schedule or discounted fee-for-service arrangement. Plaintiffs allege that Marshfield has attainted control of physician services in its market sufficient to prevent creation of competing products.

## MEMORANDUM

Summary judgment is appropriate when, after both parties have the opportunity to submit evidence in support of their respective positions and the Court has reviewed such evidence in the light most favorable to the nonmovant, there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c), Federal Rules of Civil Procedure.

A fact is material only if it might affect the outcome of the suit under the governing law. Disputes over unnecessary or irrelevant facts will not preclude summary judgment. A factual issue is genuine only if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Under Rule 56(e) it is the obligation of the nonmoving party to set forth specific facts showing that there is a genuine issue for trial.

Defendants have asserted three grounds for dismissal. They assert (1) plaintiffs lack antitrust standing and antitrust injury, (2) defendants do not have monopoly power because the relevant market is health care financing not HMO services and (3) plaintiffs do not have a claim against defendants for refusing to provide a panel of physicians under the essential facilities doctrine.

### Standing

Defendants have moved for summary judgment, asserting that plaintiffs do not have standing to maintain their antitrust action. Plaintiffs have alleged that defendants have a monopoly over physician services in the Marshfield area and as a result, Blue Cross has paid excessively high fees for physician services. Defendants assert that plaintiffs do not have standing to maintain this action because Blue Cross as a traditional indemnity insurer is not a purchaser or consumer of health care services, rather it is merely an agent for subscribers who are the purchasers or consumers of Marshfield's physician services and consequently are the only persons who have standing to bring this action.

Section 4 of the Clayton Act provides:

Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue ... and shall recover threefold the damages by him sustained, and the cost of the suit including a reasonable attorney's fee.

Although this provision could be read broadly, it has not been construed expansively. *Greater Rockford Energy & Technology Co. v. Shell Oil Co.*, 998 F.2d 391, 394 (7th Cir. 1993) *cert. denied,* — U.S. —, 114 S.Ct. 1054, 127 L.Ed.2d 375 (1994). "Given the potential scope of antitrust violations and the availability of treble damages, an over-broad reading of § 4 could result in "overdeterence", imposing ruinous costs on antitrust defendants." *Id.*

Thus the courts fashioned the doctrines of antitrust injury and antitrust standing to avoid an over broad reading of section 4. In order to bring an action pursuant to section 4 of the Clayton Act, a plaintiff has the burden to establish both antitrust injury and antitrust standing. *Id.* at 395; *S.W. Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n.*, 830 F.2d 1374, 1377 (7th Cir.1987); *Local Beauty Supply, Inc. v. Lamaur Inc.*, 787 F.2d 1197, 1201 (7th Cir. 1986). Antitrust injury is an injury to an interest protected by the antitrust laws and attributable to the antitrust violation. *Greater Rockford*, 998 F.2d at 395. In establishing antitrust injury, courts must first delineate the type of interests protected by the anti-

trust laws, and second must determine whether the violation was the cause-in-fact of the injury: that "but for" the violation, the injury would not have occurred. *Id.* In other words, antitrust injury is defined as " 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants's acts unlawful.' " *Local Beauty Supply,* 787 F.2d at 1201 *quoting Brunswick Co. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 698–90, 50 L.Ed.2d 701 (1978).

■ Antitrust standing examines the connection between the asserted wrongdoing and the claimed injury to limit the class of potential plaintiffs to those who are in the best position to vindicate the antitrust violation. *Greater Rockford,* 998 F.2d at 395. The factors to be considered in deciding whether plaintiff has standing are: "the potential for duplicative recovery, the complexity of apportioning damages, and the existence of other parties that may have been more directly harmed." *Id.* at 396, *quoting Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 111 n. 6, 107 S.Ct. 484, 490 n. 6, 93 L.Ed.2d 427 (1986), *citing Associated General Contractors, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 544, 103 S.Ct. 897, 911–12, 74 L.Ed.2d 723 (1983). Courts have at times referred to antitrust injury as an element of antitrust standing. *See Associated General,* 459 U.S. 519, 103 S.Ct. 897. Regardless of how the doctrines are conceptualized it is clear in the Seventh Circuit that both antitrust injury and antitrust standing are required under section 4. *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Laws,* § 334.3 (1993).

Defendants argue that only a consumer or a competitor may suffer an antitrust injury and that Blue Cross is neither. There are two issues raised by this challenge: (1) whether only consumers, not purchasers or buyers may suffer antitrust injury and (2) if purchasers and buyers may suffer antitrust injury is Blue Cross a purchaser or buyer of physician services.

Defendants attempt to confuse the issues by insisting that only consumers [2] suffer antitrust injury. Defendants' use of the term "consumer" is strategic because it connotes an unsophisticated member of the general public who purchases goods or services for his or her own consumption, thus excluding a professional purchaser of services such as Blue Cross. The Dictionary defines "consumer" as (1) a person or thing that consumes and (2) a person or organization that uses a commodity or service. *Random House Dictionary* 437 (2d Ed.1987). Consume is defined as "to destroy or expend by use; use up." *Id.* Thus the non legal definition of consumer requires that goods or services be used. Blue Cross does not use the medical services it purchases in the common understanding of the term.

■ Regardless of defendants' attempts to confuse the issue, it is clear from Seventh Circuit case law that antitrust standing is available to purchasers and buyers and is not restricted to "consumers" in the sense of one who actually uses the goods or services. Whether the Seventh Circuit's use of the term "consumer" embraces a professional purchaser of services such as Blue Cross or whether antitrust injury includes purchasers and buyers as well as consumers is of no significance. The result is the same. Careful interpretation of Seventh Circuit precedent reveals that a purchaser in these circumstances may suffer an antitrust injury and that Blue Cross is a purchaser of physician services.[3]

---

**2.** Neither party alleges that Blue Cross is a competitor for this purpose.

**3.** This Court notes that the Seventh Circuit has interpreted antitrust injury narrowly and is aware of the Supreme Court's holding, " 'the statute does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers ... The Act is comprehensive in its terms and coverage protecting all who are made victims of the forbidden practices by whomever they may be perpetrated.' " *Blue Shield of Virginia v.*

*McCready,* 457 U.S. 465, 472, 102 S.Ct. 2540, 2545, 73 L.Ed.2d 149 (1982) *quoting Mandeville Island Farms, Inc. v. American Crystal Sugar Co.,* 334 U.S. 219, 236, 68 S.Ct. 996, 1006, 92 L.Ed. 1328 (1948). Whether or not the Seventh Circuit has interpreted the relevant law to provide for a rule of general application that only consumers, buyers and purchasers may suffer antitrust injury is not relevant for our purposes because this Court finds Blue Cross to be a purchaser of physician services.

Defendants attempt to support their assertion that antitrust injury may only be suffered by consumers by citing to portions of *S.W. Suburban*, 830 F.2d 1374 (7th Cir.1987) and *In re Industrial Gas Litigation (Bichan v. Chemetron Corp.)*, 681 F.2d 514 (7th Cir. 1982). In analyzing antitrust injury, the Court in *S.W. Suburban* cites *Associated General*, stating "the Sherman Act was enacted to assure customers the benefits of price competition, and our prior cases have emphasized the central interest in protecting the economic freedom of **participants in the relevant market**". *S.W. Suburban*, 830 F.2d at 1379 *citing Associated General*, 459 U.S. at 538, 103 S.Ct. at 909. It is apparent that the court in *S.W. Suburban* recognized the general rule that those plaintiffs that suffer antitrust injury are "participants in the relevant market." In reasoning that a real estate listing service did not suffer an antitrust injury from a boycott of real estate brokers, the court stated that the listing service is not a participant in the market, that it did not supply real estate brokerage services, nor purchase such services. Nowhere does the court say that antitrust injury is limited to consumers or competitors, indeed the case uses the term "purchaser", not "consumer", suggesting that if the plaintiff had purchased such services it may have suffered antitrust injury.

Defendants also rely on *Bichan v. Chemetron Co.*, 681 F.2d 514 (7th Cir.1982) for the proposition that only "consumers or competitors" have antitrust injury. While the Seventh Circuit in *Bichan* states that an appropriate balance is achieved by granting standing only to "those who as consumers or competitors suffer immediate injuries with respect to their business or property, while excluding persons whose injuries were more indirectly caused by the antitrust conduct," there is nothing in the case to suggest that by using the term consumer, the court meant to exclude other direct purchasers or buyers of services or goods. The case contains no reasoning which would suggest that a plaintiff must actually use the good or service rather than purchase it. The *Bichan* case concerned an antitrust challenge by a former employee who was fired for refusing to engage in anticompetitive practices. The court held that he did not suffer antitrust injury.

Were there any doubt from Seventh Circuit precedent that a professional purchaser of goods or services could not suffer an antitrust injury, the Supreme Court's decision in *Hanover Shoe* has erased it. In *Hanover Shoe Inc. v. United Machinery Co.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968) the Court found that a middle man had standing to sue under section 4 of the Clayton Act even though the overcharge was passed through to the consumer. The Court reasoned that if the middlemen were excluded no one would sue for antitrust violations because no consumer had enough interest to sue. The Court stated

> We think it sound to hold that when a buyer shows that the price paid by him for materials purchased for use in his business is illegally high and also shows the amount of the overcharge, he has made out a prima facie case of injury and damage within the meaning of § 4.

*Id.* at 489, 88 S.Ct. at 2229. Clearly the test is whether one buys or purchases such goods or services. This result is buttressed by *O.K. Sand & Gravel Inc. v. Martin Marietta Technologies, Inc.*, 36 F.3d 565 (7th Cir. 1994). In discussing the antitrust injury of Marietta, a sand and gravel company, the court reasoned that "Marietta presented no evidence that, as a consumer, it paid a monopoly or above-the-market price ... and thus has not shown that it suffered any injury at all." *Id.* at 573. Marietta's company sold sand and gravel, *Id.* at 566, yet the court analyzed Marietta's company as a consumer.

The reasoning of the cases discussing antitrust injury focus on the **purchase** of goods or services and the injury of paying too high a price and do not address whether a product is used or consumed. The commentators have noticed the use of the consumer label and in a section titled "Consumers and Other Buyers", have explained "although no magic inheres in the "consumer" label, it is always helpful to understand whether a plaintiff is complaining of an antitrust violation disrupting competition in a market in which he **buys**." Areeda, *supra*, § 337.1 (emphasis supplied).

Other courts have noted the role of insurers as purchasers of health services. In *Kartell v. Blue Shield of Mass., Inc.,* 749 F.2d 922 (1st Cir.1984), *cert. denied,* 471 U.S. 1029, 105 S.Ct. 2040, 85 L.Ed.2d 322 (1985), the court reasoned that Blue Shield in essence buys medical services for others and that any distinction between reimbursement by third party insurers such as Blue Shield and purchasing are irrelevant for antitrust purposes. *Id.* at 926. The court noted that the relevant antitrust facts are that Blue Shield pays the bill and seeks to set the amount of the charge. *Id.*

The Seventh Circuit has also noted the reality of the health services financing market: "health care market price set for treatment is often negotiated not between patient and physician, but between patient's insurer and physician." *Nelson v. Monroe Regional Medical Center,* 925 F.2d 1555, 1564–65, n. 5. (7th Cir.1991). Similarly in *Westchester Radiological Associates P.C. v. Empire B.C. & B.S., Inc.,* 707 F.Supp. 708, 711 n. 6. (S.D.N.Y.1989), *aff'd.,* 884 F.2d 707 (2d Cir. 1989), *cert. denied,* 493 U.S. 1095, 110 S.Ct. 1169, 107 L.Ed.2d 1071 (1990), the court found unavailing an argument that Blue Cross is not a buyer because it buys on behalf of subscribers. *Id.* at 711, n. 6. The court reasoned:

> For antitrust purposes, Blue Cross is treated as a buyer where it pays the bill and seeks to set the amount charged. *See Group Life & Health Ins. Co. v. Royal Drug Co.,* 440 U.S. 205, 216, 217 [99 S.Ct. 1067, 1075–76, 1076–77, 59 L.Ed.2d 261] (1979); *Medical Arts [Pharmacy of Stamford, Inc. v. Blue Cross & Blue Shield of Connecticut, Inc.],* 675 F.2d [502] at 505 [ (2nd Cir.1982) ]; *Kartell, et al. v. Blue Shield of Mass., Inc.,* 749 F.2d 922, 925, 926 (1st Cir.1984), *cert. denied,* 471 U.S. 1029 [105 S.Ct. 2049, 85 L.Ed.2d 322] (1985); *Brillhart v. Mutual Medical Ins. Inc.,* 768 F.2d 196, 199 (7th Cir.1985); *Michigan State Podiatry Ass'n v. Blue Cross and Blue Shield of Michigan,* 671 F.Supp. 1139, 1152 (E.D.Mich.1987); *Mortensen v. First Federal Savings and Loan Ass'n,* 1975–2 Trade Cas. (CCH) ¶ 60,570 at 67,501 (D.N.J.1975), (1975 WL 972); *Sausalito Pharmacy, Inc. v. Blue Shield of California,* 544 F.Supp. 230, 233, 238 (N.D.Cal.1981), *aff'd.* 677 F.2d 47·(9th Cir. 1982), *cert. denied,* 459 U.S. 1016, 103 S.Ct. 376, 74 L.Ed.2d 510 (1982); *Ball Memorial Hospital, Inc. v. Mutual·Hospital Insurance, Inc.* 784 F.2d 1325 (7th Cir.1986); *Pennsylvania Dental Assoc. v. Medical Service Assoc.,* 815 F.2d 270 (3d Cir.), *cert. denied,* 484 U.S. 851, 108 S.Ct. 153, 98 L.Ed.2d 109 (1987); *Blue Cross and Blue Shield of Michigan v. Michigan Assoc. of Psychotherapy Clinics,* 1980–2 Trade Cas. (CCH) ¶ 63,351 (E.D.Mich.1980) [1980 WL 1848].

*Westchester,* 707 F.Supp. at 711, n. 6. The Eleventh Circuit has also held that a health insurer has antitrust injury in this situation stating that if certain health care providers are charging an inflated price "then the patient, their insurers or the government, all of whom are interested in ensuring that consumers pay a competitive price, may bring an action." *Todorov v. DCH Healthcare Authority,* 921 F.2d 1438 (11th Cir.1991).

In a case similar to the one at bar, the Third Circuit held that Blue Shield as plaintiff had standing to sue dentists for an antitrust violation. *Pennsylvania Dental Ass'n v. Medical Service Ass'n of Penn.,* 815 F.2d 270 (3rd Cir.1987), *cert. denied,* 484 U.S. 851, 108 S.Ct. 153, 98 L.Ed.2d 109 (1987). In *Pennsylvania Dental* the defendant asserted that there was no antitrust standing because only Blue Shield subscribers had standing. The court found that Blue Shield suffered antitrust injury by paying supra competitive prices. Lastly, that a health insurer may pass on a supra competitive price to the subscriber, does not destroy antitrust injury. *Reazin v. B.C. & B.S. of Kansas, Inc.,* 635 F.Supp. 1287 (D.Kan.1986), *aff'd. and remanded,* 899 F.2d 951 (10th Cir.1990), *cert. denied,* 497 U.S. 1005, 110 S.Ct. 3241, 111 L.Ed.2d 752 (1990), *citing, Hanover Shoe,* 392 U.S. 481, 88 S.Ct. 2224.

■ Construing the facts in favor of the non moving party, it is clear that Blue Cross is a purchaser of physician services and may have suffered antitrust injury, an injury which the antitrust laws intend to protect and which flows directly from the antitrust

violation. Blue Cross negotiates rates with Marshfield for physician services and arranges for payment with Marshfield. For the past six years Blue Cross has directly paid Marshfield for physician services. Blue Cross has paid Marshfield between $3.2 million and $6.5 million annually since 1988. Marshfield has never rejected a payment from Blue Cross because Blue Cross was the source of the funds rather than the patient. Blue Cross has reached agreements with Marshfield on matters such as account settlement for amounts due in excess of those Blue Cross would pay, authorization for treatment of a given individual, and payments or forgiveness of balances due in excess of the UCR.

Defendants argue that Blue Cross is not a purchaser of physician services, rather Blue Cross is merely a financing agent. Defendants argue that only the subscribers are purchasers or consumers of physician services. Defendants state that Blue Cross and Marshfield do not have a written contract by which Blue Cross pays Marshfield. Defendants state that they bill Blue Cross and accept payment directly from Blue Cross merely as a courtesy to their patients. They argue that the patients remain contractually liable for any portion of the bill not paid by Blue Cross. Defendants' argument is form over substance and ignores the reality of today's health care market. While patients may engage in some activities associated with buying physician services such as assessing quality, it is fiction to believe that patients negotiate fees for physician services and the facts presented in this case demonstrate otherwise. Blue Cross pays for physician services and negotiates the fees for the services. This is the reality of the health care financing marketplace.

Defendants attempt to distinguish the above cited cases finding health insurers to have antitrust injury by stating that the insurance policies in those cases did not allow balance billing (billing patients for amounts that exceed the UCR) whereas the insurance in this case allows for balance billing. There is nothing in the cases to suggest that the result depended on the absence of balance billing and everything to suggest that the

reasoning would be extended to embrace the current situation. The court in *Kartell* and *Westchester* stated that the relevant antitrust facts are that Blue Shield pays the bill and seeks to set the amount of the charge. *Kartell,* 749 F.2d at 926; *Westchester,* 707 F.Supp: at 711, n. 6. The relevant antitrust facts are present in both types of policies, indemnity insurance that includes balance billing as well as indemnity insurance that prohibits it. Blue Cross in this case pays the bill and seeks to set the amount of the charge. Any other result would ignore the reality of the health services financing market.

As a purchaser of Marshfield's physician services it is clear that Blue Cross may have suffered an antitrust injury. In establishing antitrust injury courts must first delineate the type of interest protected by the antitrust law and then determine whether the violation was the cause in fact of the injury: that but for the violation, the injury would not have occurred. *Greater Rockford,* 998 F.2d at 395. "The Sherman Act was enacted to assure customers the benefits of price competition, and our prior cases have emphasized the central interest in protecting the economic freedom of participants in the relevant market." *S.W. Suburban,* 830 F.2d at 1379, *citing Associated General,* 459 U.S. at 538, 103 S.Ct. at 908–09. Blue Cross alleges that Marshfield has violated the antitrust laws by monopolizing the physician services market in the Marshfield area. Because of this monopoly, alleges plaintiff, Marshfield is able to charge supra competitive prices for its physician services. Blue Cross alleges that as a purchaser or consumer of physician services, it has been injured by Marshfield's monopoly by being forced to pay supra competitive prices for physician services. If paid claims reflect excessively high prices, then the return to Blue Cross as an indemnity insurer is diminished by the amount of that excess fee or price whether such diminution occurs in the form of loss or lesser gross profit. Blue Cross is also injured by Marshfield's high prices because Marshfield is a large provider and can drive up the UCR, forcing Blue Cross to pay higher prices throughout the state of Wisconsin. Thus it is clear that Marshfield's alleged antitrust vio-

lation may be the cause of plaintiff's injuries and the antitrust laws were designed in part to provide purchasers the benefits of price competition.

Construing the facts in favor of the non moving party, plaintiffs have antitrust standing in addition to antitrust injury. Antitrust standing examines the connection between the asserted wrongdoing and the claimed injury to limit the class of potential plaintiffs to those who are in the best position to vindicate the antitrust violation. *Greater Rockford,* 998 F.2d at 395. The factors to be considered in deciding whether plaintiff has standing are: "the potential for duplicative recovery, the complexity of apportioning damages, and the existence of other parties that may have been more directly harmed." *Id.* at 396, *quoting Cargill Inc. v. Monfort of Colorado Inc.,* 479 U.S. 104, 111 n. 6, 107 S.Ct. 484, 490 n. 6, 93 L.Ed.2d 427 (1986), *citing, Associated General Contractors Inc. v. California State Council of Carpenters,* 459 U.S. 519, 544, 103 S.Ct. 897, 911–12, 74 L.Ed.2d 723 (1983).

Accepting plaintiff's facts as true for purposes of this motion, it is clear that Blue Cross is the best potential plaintiff to bring this action, if not the only realistic one. Blue Cross pays the bulk of the fee for all health services. Blue Cross pays either a large portion of or the entire usual and customary charge. The only portion the subscriber pays is the portion above this which is often insignificant in comparison to that paid by Blue Cross. Therefore subscribers have little incentive to institute costly antitrust litigation. Moreover, Blue Cross has alleged that it has paid amounts over the UCR and other disputed amounts. Blue Cross has negotiated with Marshfield over fees and there is no evidence that subscribers have. Blue Cross has made a showing that it has been directly harmed by defendants and defendants have failed to identify a potential plaintiff that was more directly harmed than Blue Cross.

Other courts have recognized the appropriateness of a health insurer bringing an antitrust action as opposed to subscribers. The Court in *Pennsylvania Dental* reasoned that "individual subscriber overcharges resulting from balance billing are relatively insignificant; hence, subscribers have only the slightest incentive to launch costly antitrust litigation in the public interest." *Pennsylvania Dental,* 815 F.2d at 277. Moreover, this is not a case like *McCready,* 457 U.S. 465, 102 S.Ct. 2540, where a subscriber is suing for an antitrust violation resulting in the complete denial of a certain type of benefit. In *McCready,* the subscriber incurred bills for psychological services. None of them were paid. In such an instance, a subscriber would have more of an incentive to sue than when the damages are only a small percentage of a charge. The Court in *Hanover Shoe* also recognized the practicality of allowing a middleman to sue noting that a consumer of shoes (meaning the person who ultimately wore the shoes) suffered only by paying an insignificantly higher price for the good and thus had little motivation to institute litigation. *Hanover Shoe,* 392 U.S. at 494, 88 S.Ct. at 2232.

There is no risk of duplicative recovery as defendants urge. Although subscribers may also have standing to sue for this violation, their damages are distinct from those of Blue Cross and may be determined with reasonable means. Subscribers are only damaged in the amount of any balance billing which can be determined from the records maintained by Blue Cross and defendants. Likewise, the apportionment of damages is not a bar to recovery because damages can be calculated by determining the amount of balance billing and the statistics provided by Blue Cross regarding the average charges for the state compared to those of Marshfield Clinic.

### Standing for Injunctive Relief

Section 16 of the Clayton Act provides in part that "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief ... against threatened loss or damage by a violation of the antitrust laws." Sections 4 and 16 of the Clayton Act "are thus best understood as providing complementary remedies for a single set of injuries." *Cargill, Inc. v. Monfort of Co., Inc.,* 479 U.S. 104, 113, 107 S.Ct. 484, 491, 93 L.Ed.2d 427 (1986). Sections 16 and 4 differ in certain ways. Section 4 requires a

plaintiff to show actual injury, but section 16 only requires plaintiff to show "threatened" loss or damage. *Id.* at 111, 107 S.Ct. at 490. Section 16 requires plaintiff to show a threatened injury for which he would be entitled to compensation if the injury actually occurred. *Id.* at 112, 107 S.Ct. at 490. Consequently plaintiff must allege threatened antitrust injury, damage or loss "of the type the antitrust laws were designed to prevent and that flows from that which makes defendant's acts unlawful." *Id.* at 113, 107 S.Ct. at 491. Standing analysis under section 16 is not always identical to that of section 4. The risk of duplicative recovery, complexity of apportioning damages, and the existence of other parties that have been more directly harmed are not factors in antitrust standing under section 16 because one injunction is as effective as 100 and 100 are not more effective than one. *Id.* at 111, n. 6, 107 S.Ct. at 490 n. 6. Thus the standing requirements for injunctive relief under section 16 have been considered less stringent. *Local Beauty Supply,* 787 F.2d at 1204.

▆ As established above, Blue Cross has made a showing sufficient to establish an inference of antitrust injury and a threat of continuing to receive antitrust injury and accordingly has established an inference of standing to sue for injunctive relief under section 16 of the Clayton Act.

### Compcare's Standing

▆ The briefing on the issue of Compcare's standing is minimal and opaque. Defendants pursue the issue by stating in a footnote "Compcare does not and cannot claim any injury from these higher fees (higher fees paid by Blue Cross for Marshfield physician services). As an allegedly excluded competitor in the financing market, its only possible source of injury is that exclusion. It cannot complain of anticompetitive conditions that it never encountered." Plaintiffs respond by stating that Compcare has standing (1) as a potential consumer of Marshfield's services and (2) as an excluded competitor of Marshfield and Security. It is undisputed that Compcare has standing as an excluded competitor. Also, Compcare has paid Marshfield for physician services by paying its enrollees' claims for "out-of-area" services, which are charges incurred when a Compcare enrollee needs emergency care and must go to a non-affiliated provider, in this case Marshfield. Compcare has standing and antitrust injury to sue for this injury.

▆ However, Compcare's claim that it has standing to sue as a **potential** consumer of physician services is less certain. Obviously, as an excluded competitor, Compcare could not have paid any fees and its antitrust injury cannot be paying higher fees. Compcare alleges its injury as a **potential consumer** is exclusion from the market. This claim is indistinguishable from its claim as an excluded competitor, for which it is undisputed that Compcare has standing and antitrust injury. As to its claim as an excluded competitor, Compcare alleges it was excluded from the market as an HMO. The exclusion was accomplished by Marshfield's refusal to deal on a competitive basis. Marshfield was able to exclude Compcare from the HMO market because it was vertically integrated via its HMO, Security. Marshfield offered a panel of physicians on a basis that Compcare believed to be prohibitively expensive. In this way Compcare was injured by exclusion from the market, not by paying high prices. Perhaps Compcare confused the issues in its effort to explain that its exclusion from the market occurred as a result of Marshfield's refusal to provide a panel of physicians at prices that were not prohibitive. Compcare can develop its theory that Marshfield's prices were too high or should have been offered on a capitated or risk sharing basis, but only within the context of a competitor, not as a **potential** consumer that has been damaged by paying high fees. Compcare has provided this Court with no authority for the proposition that a potential consumer has antitrust standing and injury to sue a supplier because its monopoly power allowed it to charge supra-competitive prices that excluded the potential buyer from the market. Instead, these cases are properly analyzed under the essential facilities doctrine where liability exists when a monopolist denies a competitor the use of an essential facility. A denial of access on reasonable terms may be sufficient to satisfy the essential facilities

doctrine; a complete denial of access may not be necessary. *See City of Chanute v. Williams Natural Gas Co.*, 955 F.2d 641, 648 (10th Cir.1992); *Sunshine Cellular v. Vanguard Cellular Systems, Inc.*, 810 F.Supp. 486, 498 (S.D.N.Y.1992). Perhaps Compcare insists on standing both as a competitor and potential buyer because it is concerned about its ability to meet the requirements of the essential facilities doctrine at trial.

### Relevant Market

■ Defendants assert that plaintiffs have no claim for monopolization of the health care financing market because defendants do not have monopoly power.[4] The parties disagree on the market definition. Defendants assert the relevant market is health care financing and plaintiffs assert it is HMO services. Defendant Security has a large percentage of HMO business but a much smaller percentage of health care financing business.

■ Section 2 of the Sherman Act provides "every person who shall monopolize, or attempt to monopolize . . . any part of the trade or commerce among the several States . . . shall be deemed guilty . . ." The offense of monopoly under section 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of the power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident. *U.S. Grinnell*, 384 U.S. 563, 570–571, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966). Monopoly power is the power to control prices or exclude competition. *Id.* at 571, 86 S.Ct. at 1704; *U.S. v. E.I. du Pont & de Nemours Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). The existence of such power may be inferred from the predominant share of the market. *Grinnell*, 384 U.S. at 571, 86 S.Ct. at 1704.

■ Commodities reasonably interchangeable make up that "part" of trade or commerce which section 2 protects against monopoly power. *Id.* Control of the relevant market depends upon the availability of alternative commodities for buyers: *ie.* whether there is a cross-elasticity of demand. *du Pont*, 351 U.S. at 380, 76 S.Ct. at 998–99. Interchangeability is largely gauged by the purchase of competing products for similar uses considering price, characteristics and adaptability of the competing commodities. *Id.* In considering whether products are interchangeable, the court looks at whether the product has qualities that are not possessed by a number of other products. *See id.* at 399, 76 S.Ct. at 1009. "Claims of monopolization under section 2 of the Sherman Act . . . require the trier of fact to delineate the relevant market." *Fishman v. Wirtz*, 807 F.2d 520, 531 (7th Cir.1986) (emphasis supplied). "In making this determination, the trier must decide whether the product is unique or has close substitutes, as to which there are substantial cross-elasticity of demand." *Id.* (emphasis supplied.)

■ It is clear from a review of the relevant law that determination of the relevant market is an issue of fact for the jury. The parties dispute the definition of the relevant market. Plaintiffs assert it is HMO services. Defendants assert that it includes all health care financing such as traditional indemnity insurance, PPOs, and HMOs. Plaintiffs note that HMOs have certain peculiar characteristics that justify an HMO submarket such as (a) a distinct cost advantage that is confirmed by market data, (b) management of care through utilization controls and prevention oriented steps, and (3) sharing of risk among providers, through capitation, withhold, or otherwise marketed by lower pricing and means. Plaintiffs have pursued a genuine issue as to the cross-elasticity of demand for HMOs and other health care financing. Summary judgment on such a fact intensive issue would be inappropriate.

Defendants claim that it has been established that the relevant market is health care

---

4. Defendants missed a logical step in their argument. Defendants launch directly into a discussion of the relevant market without explaining its significance. To establish a claim under section 2, a plaintiff must demonstrate that the defendant has monopoly power. Defining the relevant market helps to make this determination. A defendant may have monopoly power in one product market but not another.

financing and not HMO services. As support for this proposition, defendants cite principally to *Ball Memorial Hospital Inc. v. Mutual Hosp. Ins. Inc.*, 784 F.2d 1325 (7th Cir.1986) and *U.S. Healthcare Inc. v. Healthsource, Inc.*, 986 F.2d 589 (1st Cir.1993). In these cases the fact finder found the relevant market to be health care services including HMOs, traditional indemnity insurance, PPOs and others. However these factual findings have no more precedential value than a finding that a defendant was negligent in a negligence action. In neither case did the court rule as a matter of law that the relevant market was health care financing. Indeed, the court in *U.S. Healthcare*, stated:

> In practice, the frustrating but routine question how to define the product market is answered in antitrust cases by asking expert economists to testify. Here the question for an economist would be whether a sole supplier of HMO services ... could raise price far enough over cost, and for a long enough period, to enjoy monopoly profits.

*Id.* at 599.[5]

### Essential Facilities Doctrine

Compcare argues that the availability of a panel of physicians on a capitated basis is an "essential facility" for it to compete in the HMO market. Compcare alleges that Marshfield monopolizes physician services and has not made available a panel of physicians to Compcare. Defendants argue that there is no evidence to support this claim and that summary judgment should be entered dismissing it.

■■■■■ A monopolist's refusal to deal is governed by the "essential facilities doctrine." *MCI Communications Co. v. AT & T Co.*, 708 F.2d 1081, 1132 (7th Cir.1983).

> Such a refusal may be unlawful because a monopolist's control of an essential facility can extend monopoly power from one stage of production to another, and from one market into another. Thus, the antitrust laws have imposed on firms controlling an essential facility the obligation to

make the facility available on non-discriminatory terms.

The case law sets forth four elements necessary to establish liability under the essential facilities doctrine: (1) control of the essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility

*Id.* at 1132–1133. To be essential, a " 'facility need not be indispensable; it is sufficient if duplication of the facility would be economically infeasible and if denial of its use inflicts a severe handicap on potential market entrants.' " *Fishman v. Estate of Wirtz*, 807 F.2d 520, 539 (7th Cir.1986) (citations omitted.), *accord, MCI*, 708 F.2d at 1148 (factors to be considered are whether duplication of the facility would be "economically infeasible" or that denial of access inflicted a "severe handicap" on market entrants.) Whether something is an "essential facility" is an issue of fact. *See Advanced Health–Care Services Inc. v. Radford Community Hosp.*, 910 F.2d 139, 150–151 (4th Cir.1990); *see also MCI*, 708 F.2d 1081 and *Fishman*, 807 F.2d 520.

■■■■ Defendants have failed to meet their burden to show the absence of any material fact as to the four elements necessary for a violation of the essential facilities doctrine. Defendants assert that the first element, control of an essential facility by a monopolist, is lacking because defendants are not monopolists because the relevant market is health services financing not HMO services. This position was rejected earlier as premature, and this argument is also premature. Plaintiffs have raised an issue of fact as to the second element, whether the competitor is unable to practically or reasonably duplicate the facility. Plaintiffs have presented evidence that no effective HMO network can be formed without the Marshfield physicians at a reasonable price. Plaintiffs have alleged that they face enormous barriers to entry into the market and are not in the business

---

**5.** Because the Court rejected defendants' argument that the relevant market is health care financing, this Court need not address defendants' argument that defendants do not have monopoly power in the health care financing market.

 

of establishing physician services. Plaintiffs have alleged that defendants have denied them access to the facility on a competitive basis by refusing to offer a panel of physicians on a basis other than a fee for service basis and that it is feasible for defendants to offer plaintiffs such a panel of physicians. Accordingly plaintiffs have pursued issues of material fact which need be resolved by a jury.

### ORDER

IT IS ORDERED that defendants' motion for summary judgment is DENIED.