## In re COPPER ANTITRUST LITIGATION.

Ocean View Capital, Inc., f/k/a Triangle Wire & Cable, Inc., Plaintiff,

v.

Sumitomo Corporation of America, Sumitomo Corporation, Sumitomo Futures Corporation, Yasuo Hamanaka, Global Minerals and Metals Corporation, David Campbell, and Credit Lyonnais Rouse, Defendants.

M.D.L. No. 1303, No. 99–C–801–C.

United States District Court, W.D. Wisconsin.

May 9, 2000.

S.C., Milwaukee, WI, for Loeb Industries, Inc.

David H. Weinstein, Weinstein, Kitchenoff, etc, Philadelphia, PA, for Los Angeles Scrap Iron & Metal C.

Arthur M. Kaplan, Fine, Kaplan & Black, Philadelphia, PA, for Metal Prep Company, Inc.

Jon P. Axelrod, Dewitt Ross & Stevens, Madison, WI, for CBS Corp., Emerson Electric Co., Westinghouse Electric Corp.

Sanford P. Dumain, Milberg, Weiss, Bershad, Hynes & Lerach, L.L.P., New York City, for Ocean View Capital, Inc.

Robert B. Bernstein, Kaye, Scholer, Fierman, Hays & Handl, New York City, for Metallgesellschaft AG, MGTS UK Holding, Ltd.

Alexandre De Gramont, Crowell & Moring LLP, Washington, DC, for So.Calif.Edison Co. (Prop Interv).

David R. Cross, Quarles & Brady, Milwaukee, WI, for Sumitomo Corporation, Sumitomo Corporation of America, Sumitomo Futures Corporation.

H. Peter Haveles, Jr., Cadwalader, Wickersham & Taft, New York City, for Carl R. Alm, R. David Campbell, Copper Antitrust Litigation, Global Minerals and Metals Corp.

Yasuo Hamanaka, Tokyo, Japan, for Hamanaka, Yasuo.

David J. Harth, Foley & Lardner, Madison, WI, for Merrill Lynch & Co., Inc., Merrill Lynch International Inc., Merrill Lynch Pierce Fenner.

Robert Horowitz, Stafford Rosenbaum LLP, Madison, WI, for Credit Lyonnais Rouse, Ltd.

John F. Cambria, Salans Hertzfeld Heilbronn Christy V, New York City, for Ashley Levett, Charles Vincent.

William R. Steinmetz, Reinhart, Boerner, Van Deuren, Norris & Rieselbach,

## OPINION AND ORDER

CRABB, District Judge.

This is a civil action for monetary, declarative and injunctive relief brought pursuant to the Sherman Act, 15 U.S.C. § 1, and R.I.Gen.Laws § 6–36–4. Plaintiff Ocean View Capital, Inc. contends that defendants Sumitomo Corporation of America, Sumitomo Corporation, Sumitomo Futures Corporation, Yasuo Hamanaka, Global Minerals and Metals Corporation, David Campbell and Credit Lyonnais Rouse violated federal and state antitrust statutes by entering into a conspiracy to raise the price of copper to artificially high and noncompetitive levels through manipulation of the copper futures markets. (Plaintiff sued Ashley Levett and Charles Vincent in addition to the other defendants; its complaint was dismissed as to these two defendants for lack of personal jurisdiction.) Presently before the court is a joint motion to dismiss filed pursuant to Fed.R.Civ.P. 12(b)(6) by defendants Sumitomo Corporation of America, Sumitomo Corporation, Sumitomo Futures Corporation, Global Minerals and Metals Corporation and David Campbell. These defendants contend that plaintiff does not have antitrust standing to bring claims against them. Also before the court is a motion to dismiss filed pursuant to Fed.R.Civ.P. 12(b)(6) and 12(b)(1) by defendant Credit Lyonnais Rouse. Defendant Credit Lyonnais contends that plaintiff has not alleged facts sufficient to state a claim of conspiracy against it and alternatively, that plaintiff's claim against it is barred by the statute of limitations. All defendants urge this court to decline supplemental jurisdiction over plaintiff's state law claim. I conclude that plaintiff has alleged sufficient facts to defeat all of the pending motions.

For the sole purpose of deciding this motion, I find that plaintiff's complaint fairly alleges the following.

## ALLEGATIONS OF FACT

### I. PARTIES

Plaintiff Ocean View Capital, Inc. is a corporation organized and existing under the laws of Delaware with its principal place of business in Rhode Island. During the period of time relevant to this complaint, plaintiff was known as Triangle Wire & Cable, Inc. Until October 31, 1996, Triangle Wire was engaged in the manufacture of copper wire and cable, for which it purchased refined copper at a cost of approximately $350 million in the years 1995 and 1996 alone. Until 1996, plaintiff was among the largest purchasers of refined copper for wire and cable manufacture in the United States.

Defendants Sumitomo Corporation (a foreign corporation) and its affiliates Sumitomo Corporation of America (a New York corporation) and Sumitomo Futures Corporation are, collectively, one of the world's largest refiners and sellers of physical copper as well as one of the world's biggest traders of copper futures. (Throughout this opinion, I will used the name "Sumitomo" to refer to all three Sumitomo defendants.) Sumitomo markets copper through the Copper Metals Section of its Non–Ferrous Metals Department, which engaged in both the purchase and sale of physical copper and hedging with futures. Sumitomo owns large amounts of the world's supply of physical copper and is one of the world's largest copper producers. Sumitomo has market power in the copper futures market and in the market for physical copper.

Defendant Yasuo Hamanaka headed Sumitomo's copper trading operations from August 1987 until about June 13, 1996. Defendant Hamanaka traded both physical copper and copper futures for Sumitomo. In February 1997, defendant Hamanaka pleaded guilty in a Japanese court to criminal charges related to the events at issue in this complaint.

Defendant Global Minerals and Metals Corporation is a Delaware corporation that is authorized to do business in New York. Defendant David Campbell was a principal

of Global during the time relevant to this complaint. Defendant Global is a refiner and seller of physical copper and a trader of copper futures. Beginning at least as early as 1993, Global conspired with Sumitomo to manipulate the price of physical copper and copper futures. In furtherance of the conspiracy, Global maintained at least two brokerage accounts in Sumitomo's name that were used to coordinate market actions between Global and Sumitomo. Global and Sumitomo engineered a series of transactions by which Sumitomo bought copper and resold it immediately to Global's supplier for the express purpose of causing copper prices to appear to increase. Global and Sumitomo agreed by contract to share in any price appreciation for copper.

Former defendants Ashley Levett and Charles Vincent are principals of Winchester Commodities Group, Winchester Asset Management, Ltd., Winchester Holdings USA Inc. and Winchester USA Inc. The Winchester corporations are not named as defendants in this action because they are involved in pending bankruptcy proceedings in the United Kingdom. Levett and Vincent profited by forwarding instructions from Sumitomo to its broker, defendant Credit Lyonnais Rouse, for trading on the London Metal Exchange and elsewhere and provided other services that went beyond ordinary financial services and furthered Sumitomo's conduct. Levett and Vincent knew that they were helping Sumitomo act unlawfully. Winchester gave kickbacks or "gratuities" to defendant Hamanaka in order to keep defendant Sumitomo's business.

Defendant Credit Lyonnais Rouse acted as Sumitomo's dealer in copper, copper futures and copper options transactions. Defendant Credit Lyonnais made trades and undertook other acts and services for Sumitomo stock that went beyond ordinary financial services and furthered defendant Sumitomo's unlawful conduct. Defendant Credit Lyonnais was entitled to 20% of Winchester's profits, had an option to ac-
quire 20% of Winchester's share capital and was a partner with Winchester in its wrongful dealings.

## II. DEFENDANTS' WRONGFUL CONDUCT

### A. *The Copper Market*

Copper is traded on various exchanges, including the Commodity Exchange, Inc. (COMEX) Division of the New York Mercantile Exchange and the London Metal Exchange (LME). From an economic standpoint, COMEX and LME function as a single market. Prices on one market vary with prices on the other. To the extent there are price discrepancies between the markets, physical copper can be shifted easily between the LME warehouse in Long Beach, California and COMEX warehouses in Arizona.

On the exchanges, copper futures contracts are traded along with physical copper. Futures contracts are firm commitments to make or accept delivery of a specified quality and quantity of copper during a specific month in the future at a price agreed upon at the time the commitment is made. Generally the price for futures varies directly with the price for physical copper, although the price for futures is usually higher because it includes financing, insurance costs and storing charges.

Plaintiff did not participate in the exchanges. It purchased all of its copper on the cash market, including copper sold to it by Sumitomo. Prices of copper on the cash market are set by reference to the price (or, in some cases, a monthly average price) of copper futures on the COMEX plus a "basis" price (a premium factor), determined at the time of contracting. Therefore, a manipulation of the price of copper futures on the COMEX or the LME would correlate directly and predictably with changes in copper prices on the cash market.

### B. *Defendants' Actions With Respect To the Copper Market*

During the period from 1990 through June 13, 1996, defendant Sumitomo acted through its head trader, defendant Hamanaka, to become the markets' single largest participant in physical copper and copper futures. As part of its marketing of copper, Sumitomo engaged in futures and options transactions worth approximately $20 billion annually on world markets, including COMEX and LME.

Between 1990 and June 13, 1996, defendants conspired to manipulate and corner the market for physical copper and copper futures. Defendants limited the supply of copper and increased the demand for it, thereby causing copper prices to rise to artificially high and noncompetitive levels.

In 1990, defendant Sumitomo acted through its employee, defendant Hamanaka, to formulate a so-called "master plan" for manipulating copper exchange contract prices that involved accumulating large copper exchange positions among other things. Defendant Sumitomo followed this master plan in late 1991 and mid-1993 to manipulate copper exchange contract prices. For example, in June 1993, defendants Sumitomo and Hamanaka executed a huge trade with Sumitomo's purported competitor Winchester, through defendant Credit Lyonnais, to acquire control of at least 1,005,000 tons of copper (approximately 10% of the world market) primarily through call options.

Defendant Sumitomo halted its manipulations temporarily in 1993 when the LME took emergency action after Sumitomo was unable to demonstrate any genuine need in its cash market operations for its large copper exchange positions. Even after defendant Sumitomo conducted a special audit in 1994 that in all likelihood revealed Hamanaka's 1993 copper trading manipulations, it rewarded him with substantial promotions and continued to encourage his activities.

Defendant Credit Lyonnais's role in financing Sumitomo and Winchester during the 1993 manipulation led to an LME investigation and a warning that Credit Lyonnais could be expelled from the LME. Ultimately, the LME levied the most severe financial sanction in its history against defendant Credit Lyonnais. Despite this, defendant Credit Lyonnais did not withdraw from the conspiracy. Until 1997, it continued to conceal its financial interest in Winchester.

After the LME's emergency action in 1993, defendant Sumitomo began working with its purported competitor, defendant Global, to effectuate its unlawful "master plan." Defendants Sumitomo and Global entered into joint brokerage accounts that were used to coordinate their copper market activities, allowing Global to use Sumitomo's credit to make trades in conjunction with Sumitomo while deflecting regulatory and other attention away from Sumitomo. Sumitomo and Global also entered into a series of contracts for the purchase and sale of physical copper that contained unusual minimum price and price participation provisions. Under the minimum price provision, Sumitomo was required to purchase copper at the higher of the market price (the LME settlement price) at the time of shipment of the monthly quote or the minimum price set by Sumitomo during a specified time period. The contracts also required that Global pay Sumitomo as price participation thirty percent of any positive difference between the market price at the time of shipment and the minimum price on futures contracts established to hedge the supply contracts. Therefore, purported competitors Sumitomo and Global would share in any price appreciation of copper above the pre-established minimum price. The contracts were designed to give the appearance of increased demand, trading activity and price support even though less than half of the copper under the contracts was ever physically delivered.

In 1993 and 1994 and continuing until 1996, Sumitomo sold unprecedented volumes (more than $300 million worth each year) of copper put options, many of which were "deep in the money," meaning that their exercise price was well above the market price. Although Sumitomo and Global held themselves out as competitors, in 1994 and early 1995, they acted in concert to purchase and build up the largest long position ever heard of in the copper exchange market. These purchases accomplished Sumitomo's and Global's common goal of artificially increasing the demand for copper and copper prices. In 1995, as this long position matured, Sumitomo and Global rolled the position forward and took deliveries thereon. Through these deliveries, Sumitomo and Global built up a position comprising more than 90% of the copper in copper exchange warehouses located in the United States as well as in the entire world. This position restricted copper supply and drove up the price of copper and had no legitimate commercial need or purpose. As a result of these actions, Sumitomo and its co-conspirators acquired a dominant and controlling cash and futures market position that directly and predictably caused artificially high levels for copper prices, including prices on the United States cash and futures market.

From October 1995 to early January 1996, Sumitomo and Global flouted established and sensible business practices by refusing to lend to other market participants in any significant amounts and any significant duration the copper they held in copper exchange warehouses. To subsidize its long position, Sumitomo borrowed money uneconomically between October 1995 and May 1996. Similarly, during early 1996, Global obtained financing at "away from the market" prices. To improve the appearance of its financial position in order to obtain financing, Global parked losing trades from an account held jointly by Sumitomo and Global into an account held by Sumitomo individually. During 1995 and 1996, when the copper exchanges and the Commodity Futures Trading Commission inquired about the purpose for these long positions, Sumitomo and Global represented that the positions were needed for their copper businesses. For example, Sumitomo and Global created with others illusory cash market contracts that may have helped commercially justify their large long positions. These representations induced inaction by the exchanges and the commission.

In order to deflect further regulatory attention while allowing Sumitomo and Global to exert maximum effect upon prices, defendants Sumitomo and Global operated brokerage accounts together that were held in Sumitomo's name but managed and traded by Global, which held a power of attorney. Defendants Global and Sumitomo regularly discussed and coordinated their price manipulation and acted in concert in making false statements to the market place and regulators. By the spring of 1996, Sumitomo's and Global's prolonged impact on copper prices had attracted an intensifying investigation by the Commodities Futures Trading Commission into the possible manipulation of COMEX futures prices. Because of the investigation, Sumitomo and Global abruptly liquidated the long position in a manner inconsistent with commercial needs.

When the manipulation came to light in June 1996, Sumitomo fired defendant Hamanaka. Before this time, Sumitomo's activities helped it to acquire a dominant and controlling cash market and copper futures market position, directly and predictably causing prices on the United States cash and futures markets to reach artificially high levels. Among the incentives for Sumitomo's conduct was its potential to earn profits as one of the world's largest sellers of copper products, whose price depends directly on the COMEX price. In addition, the puts Sumitomo had sold for over $300 million a year lost their value to their purchasers because they no longer

had an exercise price well above the market price. This decline in the difference between exercise price and market price enabled Sumitomo to pocket $300 million the purchasers had paid for the puts.

Defendants intended to cause and did cause the prices of copper futures and physical copper to increase to artificially high levels. Sumitomo's dominant position in the physical copper and copper futures market and its acts in concert with others had a direct consequence: defendants were able to maintain artificially inflated prices for an extended period of time.

Sumitomo's market dominance began to decline after Sumitomo reassigned Hamanaka in May 1996. Copper prices dropped from highs of around $2,800 a metric ton to below $2,000 a metric ton after the announcement of Hamanaka's dismissal. These price levels persisted for several months thereafter. Because copper contracts are generally priced by reference to the LME price or the COMEX price, Sumitomo's conduct caused distorted and artificial pricing of copper, including throughout the United States cash market.

### C. Harm to Plaintiff Caused by Manipulation

As a major purchaser of copper, plaintiff was harmed by defendants' manipulation of copper prices. Plaintiff's purchases of copper (approximately $350 million for 1995 and 1996 combined) were made at artificially high prices.

## OPINION

### I. CHOICE OF LAW

█ Plaintiff filed its complaint in the District Court for the Southern District of New York. On December 13, 1999, the Judicial Panel on Multidistrict Litigation transferred the action to this district pursuant to 28 U.S.C. § 1407 for coordinated or consolidated pretrial proceedings with other similar cases filed here. This transfer raises the question whether this court is bound to apply the law of the Second Circuit, that of the Seventh Circuit or nei-

ther. "[A] transferee court normally should use its own best judgment about the meaning of federal law when evaluating a federal claim." *Eckstein v. Balcor Film Investors*, 8 F.3d 1121, 1126–27 (7th Cir.1993) (concluding, however, that when, as was the situation in that case, "the law of the United States is geographically non-uniform, a transferee court should use the rule of the transferor forum"); *see also Menowitz v. Brown*, 991 F.2d 36, 40 (2d Cir.1993) ("a transferee federal court should apply its interpretations of federal law, not the constructions of federal law of the transferor circuit"); *Mark v. Keycorp Mortgage Inc.*, No. 95 C 4878, 1996 WL 465400 at *6 n. 4 (N.D.Ill. Aug.8, 1996) (distinguishing facts in *Eckstein* and concluding that "[u]nder *Eckstein*, when the federal law is interpreted differently among the circuits, but is meant to have only one interpretation, as with RICO law, the law of the transferee court applies."); 17 James Wm. Moore, *Moore's Federal Practice* § 112.07(2)(c) (3d ed.) ("the courts have held that a transferee court should be free to decide a federal claim in the manner it views as correct, without deferring to the interpretation of that federal law made by a transferor circuit"). In determining these motions to dismiss, choice of law is not an outcome-determinative decision. It may become more important at a later stage. At this point, I will decide the pending motions to dismiss in the manner I believe to be correct, after considering the applicable case law from both the Second and Seventh Circuits.

### II. MOTION TO DISMISS STANDARD

In considering a motion to dismiss for failure to state a claim, the court must accept as true the well-pleaded factual allegations in the complaint, drawing all reasonable inferences in favor of the plaintiff. *See Hishon v. King & Spalding*, 467 U.S. 69, 72, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). The court may dismiss a complaint for failure to state a claim under Fed.

R.Civ.P. 12(b)(6) only if the plaintiff can prove no set of facts in support of its claim that would entitle it to relief. *See Porter v. DiBlasio*, 93 F.3d 301, 305 (7th Cir. 1996).

The standard for pleading is low, requiring only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). A plaintiff is not required to plead the particulars of his or her claim unless it is based on fraud or mistake. *See Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 168, 113 S.Ct. 1160, 1163, 122 L.Ed.2d 517 (1993); *Hammes v. AAMCO Transmissions, Inc.*, 33 F.3d 774, 778 (7th Cir.1994). "One pleads a 'claim for relief' by briefly describing the events." *Sanjuan v. American Bd. of Psychiatry and Neurology*, 40 F.3d 247, 251 (7th Cir.1994). Matching facts against legal elements comes later, such as in consideration of motions for summary judgment. *See id.; Palmer v. Board of Education Community Unit School District*, 46 F.3d 682, 688 (7th Cir. 1995). On a motion to dismiss, "the plaintiff receives the benefit of the imagination, so long as the hypotheses are consistent with the complaint." *Sanjuan*, 40 F.3d at 251 (citation omitted). The pleading rule is equally applicable in antitrust cases. *See MCM Partners v. Andrews–Bartlett & Associates*, 62 F.3d 967, 976 (7th Cir.1995); *Sanjuan*, 40 F.3d at 251; *Hammes*, 33 F.3d at 782. Indeed, "in antitrust cases, where 'the proof is largely in the hands of the alleged conspirators,' *Poller v. Columbia Broadcasting System*, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 746, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976). *See also Continental Orthopedic Appliances v. Health Insurance Plan of Greater New York*, 956 F.Supp. 367, 370 (E.D.N.Y.1997). This does not mean, however, that "conclusory statements [may] substitute for minimally

sufficient factual allegations." *Electronics Communications Corp. v. Toshiba America Consumer Products, Inc.*, 129 F.3d 240, 243 (2d Cir.1997). A plaintiff must provide the defendant with minimal notice of the claim, *see Jackson v. Marion County*, 66 F.3d 151, 153 (7th Cir.1995), and include enough information to "outline or adumbrate" the basis of the claim, *Panaras v. Liquid Carbonic Industries Corp.*, 74 F.3d 786, 792 (7th Cir.1996).

## III. ANTITRUST STANDING

Section 1 of the Sherman Act, 15 U.S.C. § 1, makes illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." Section 4 of the Clayton Act, 15 U.S.C. § 15, provides a federal cause of action to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" and provides for successful plaintiffs to recover triple damages, costs and attorney fees. Although the language of section 4 of the Clayton Act is broad, courts have interpreted it more narrowly. *See Blue Shield of Virginia v. McCready*, 457 U.S. 465, 477, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982) ("It is reasonable to assume that Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property").

Parties who may bring an antitrust action are limited to those 1) who have suffered the type of injury that the antitrust laws were intended to prevent (antitrust injury) and 2) whose injuries are a result of defendant's unlawful conduct (antitrust standing). *See Serfecz v. Jewel Food Stores*, 67 F.3d 591, 595 (7th Cir. 1995) (citing *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)); *Blue Cross & Blue Shield v. Marshfield Clinic*, 881 F.Supp. 1309, 1314–15 (W.D.Wis.1994).

To establish an antitrust injury, which is sometimes considered an element of antitrust standing, a plaintiff must be able to show that the antitrust laws protect his or her interests and that the violation was the cause-in-fact of the injury. *See Blue Cross*, 881 F.Supp. at 1314–15. Plaintiff's loss must be attributable to the "anti-competitive aspect of the practice under scrutiny." *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990). One purpose of the antitrust laws is to protect consumers from the anti-competitive conduct of suppliers. *See Serfecz*, 67 F.3d at 597; *Stamatakis Industries, Inc. v. King*, 965 F.2d 469, 471 (7th Cir.1992). Consumer plaintiffs must show that their injury results from acts of defendant that reduce output or raise prices in the relevant market. *See Stamatakis*, 965 F.2d at 471.

The determination of antitrust standing requires an examination of the connection between the asserted wrongdoing and plaintiff's claimed injury. *Blue Cross*, 881 F.Supp. at 1315. Only those who are in the best position to vindicate the alleged violation are awarded standing; plaintiffs whose injuries are indirect or secondary will be unsuccessful. *Id.* "When the plaintiff's injury is linked to the injury inflicted upon the market ... the compensation of the injured party promotes the designated purpose of the antitrust law—the preservation of competition." *Id.* at 597. To test whether a private plaintiff has antitrust standing, a court should assume the existence of an antitrust violation and determine whether the standing elements are shown. 2 Phillip E. Areeda and Herbert Hovenkamp, *Antitrust Law* ¶ 360f (revised ed.1995). For the purpose of these motions, defendants appear to concede that the antitrust laws were violated.

■ The Supreme Court has distinguished the two standing requirements a plaintiff must meet in antitrust cases: standing under Article III of the Constitution and "antitrust standing." *See Associated General Contractors of Cal., Inc. v.*

*California State Council of Carpenters*, 459 U.S. 519, 535 n. 31, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). The latter requirement obliges the court to determine whether the plaintiff is a proper party to bring a private antitrust action. *See id.* The factors a court may consider in making that determination include a causal connection between the alleged antitrust violation and harm to the plaintiff and defendants' intent to cause the harm; whether the injury was of a type the antitrust statute was intended to forestall; the directness or indirectness of the asserted injury; the existence of more direct victims who can assert a claim against the wrongdoer; the speculative nature of the damages; and the risk of duplicative recoveries or complex apportionment of damages. *See id.* at 537–45, 103 S.Ct. 897. Different courts and commentators have listed the factors differently, but all agree on the relevant issues. *Cf. Sanner v. Board of Trade of City of Chicago*, 62 F.3d 918, 927 (7th Cir.1995); *de Atucha v. Commodity Exchange, Inc.*, 608 F.Supp. 510, 514–518 (S.D.N.Y.1985); 2 Areeda & Hovenkamp at ¶ 360d (interpreting *Associated General Contractors* as listing three factors: (1) injury-in-fact and clarity of claimed damages; (2) directness, duplication, complex apportionment and alternative plaintiffs; and (3) antitrust injury). Several of the factors overlap, as will be seen in the discussion that follows. Difficulties arise when the factors do not all point toward the same result. The Supreme Court has not yet provided any guidance to the lower courts in determining how to balance the factors in that circumstance. *See* 2 Areeda & Hovenkamp at ¶ 360d.

### A. Application of the Associated General Factors

#### 1. Causal connection between alleged antitrust violation and plaintiff's harm

Defendants concede that plaintiff satisfies this factor "by virtue of its allegations of 'but for' causation and the defendants'

intent to raise prices on the cash markets." Mem. of Law in Supp. of Sumitomo Defs.' Mot. to Dismiss the Am.Compl. at 13. Plaintiff was harmed when it paid artificially inflated prices to purchase physical copper. Those prices were artificially inflated because of defendants' intentional manipulation of the futures markets. The first factor points in plaintiff's favor.

2. *Whether the injury was of a type Congress sought to redress with the antitrust laws*

In *Associated General,* the Court noted that its "prior cases have emphasized the central interest in protecting the economic freedom of participants in the relevant market." *Associated General Contractors of Cal.,* 459 U.S. at 538, 103 S.Ct. 897. The parties disagree whether plaintiff and defendants were participants in the same market. Defendants argue that they restrained trade primarily on the LME and not the cash market in which plaintiff did business. Plaintiff asserts that it has alleged sufficient facts that the futures and cash markets are the same market for purposes of an antitrust violation and that the Seventh Circuit has agreed with such an interpretation of the relevant market. *See Sanner,* 62 F.3d 918.

In *Sanner,* plaintiffs were sellers in the soybean *cash* market complaining about a drop in prices caused allegedly by the Chicago Board of Trade's resolution that brought about a fall in the prices of soybean *futures* contracts. *See id.* at 927. Plaintiffs claimed that the board acted intentionally to cause a decline in both the futures and cash markets. The court was not persuaded that any injury suffered by the farmers was too indirect to confer antitrust standing because the resolution was directed at the futures market for soybeans and the farmers did not participate in that market. *See id.* at 927–28. Rather, it noted that the "fact that cash and futures markets may be distinguished certainly does not show that they are unrelated for the purposes of antitrust standing

analysis." *Id.* at 929. Both markets involve the same commodities to be delivered currently or in the future; thus, when there is a significant price change in the futures market, the cash market will usually experience a similar movement. *See id.* Because the cash and futures markets tend to move in lockstep, "participants in the cash market can be injured by anticompetitive acts committed in the futures market. The futures market and the cash market for soybeans are thus 'so closely related' that the distinction between them is of no consequence to antitrust standing analysis." *Id.* at 929 (citing *Amey, Inc. v. Gulf Abstract & Title, Inc.,* 758 F.2d 1486, 1496 (11th Cir.1985)).

In the alternative, the court held, even if there were a relevant distinction between the cash and futures markets, the plaintiffs had alleged direct harm caused by defendant's intent to cause a price decline in the cash market and this was sufficient to withstand a motion to dismiss. *See id.* at 929. In earlier opinions, the Court of Appeals for the Second Circuit and the District Court for the Southern District of New York addressed somewhat similar situations: antitrust claims dealing with the relationship between various futures markets or between futures and cash markets. *See Reading Industries v. Kennecott Copper Corp.,* 631 F.2d 10 (2d Cir.1980); *de Atucha v. Commodity Exchange, Inc.,* 608 F.Supp. 510 (S.D.N.Y.1985). de Atucha was a citizen of Argentina who purchased silver contracts on the LME at artificially high prices and asserted that the defendants produced his injury on the LME by manipulating American silver markets. *See de Atucha,* 608 F.Supp. at 511–513. The court accepted as true for the purpose of the motion to dismiss that the U.S. futures markets and the LME functioned as a single market from an economic standpoint, but concluded that "Congress did not contemplate recovery under the antitrust laws by an individual who traded, and was injured entirely outside of United States commerce." *Id.* at 517–18. In

*Reading,* the court granted the defendants' motion for summary judgment on grounds that will be discussed below; it issued its opinion before the Supreme Court decided *Associated General Contractors,* but seemed to conclude that for antitrust purposes, the market for refined copper that the defendants manipulated was separate from the market for copper scrap on which the plaintiff paid higher prices. *See Reading,* 631 F.2d at 13–14.

Plaintiff has alleged that "COMEX and the LME function from an economic standpoint as a single market." Compl. ¶ 17. I have accepted that fact as true for the purpose of deciding this motion. *See Associated General Contractors,* 459 U.S. at 526, 103 S.Ct. 897; *Sanner,* 62 F.3d at 927; *de Atucha,* 608 F.Supp. at 517–18. Similarly, I must accept as true plaintiff's allegation that

> "prices of copper on the cash market are set by reference to the price (or, in some cases, a monthly average price) of copper futures on the COMEX and, [sic] plus a 'basis' price (a premium factor), determined at the time of contracting. Therefore, a manipulation of the price of copper futures on the COMEX and/or the LME would directly and predictably correlate with a manipulation of copper prices on the cash market."

Compl. ¶ 20. Later, plaintiff alleges that the price of copper products "depends directly on the COMEX price." Compl. ¶ 41. Although plaintiff has not alleged specifically that the futures and cash markets are the same for the purpose of an antitrust analysis, it has alleged that COMEX and the LME function as one market, that prices of copper on the cash market are directly related to COMEX prices and that defendants intended to raise copper prices on the cash market. Plaintiff was clearly "within that area of the economy ... endangered by [the] breakdown of competitive conditions" resulting from defendants' actions. *See Blue Shield of Virginia v. McCready,* 457 U.S. 465, 480, 102 S.Ct. 2540 (holding that consumer of psychotherapy services entitled to financial benefits under health plan had antitrust standing to sue plan).

In addition, plaintiff "must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be 'the type of loss that the claimed violations ... would be likely to cause.'" *McCready,* 457 U.S. at 482, 102 S.Ct. 2540 (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) (internal citation omitted) (emphasis in original)). Plaintiff's injury of paying higher prices reflects the anticompetitive effect of the violation, making it a sufficient antitrust injury.

3. *Directness between the injury and the market restraint*

█ Plaintiff was injured on the cash market, most of the alleged anti-competitive acts occurred on the LME and plaintiff never purchased copper pursuant to one of the minimum price contracts between defendants Sumitomo and Global that are alleged to have inflated the price of copper generally. From this, defendants argue that plaintiff's injury must be indirect.

In *Associated General Contractors,* 459 U.S. 519, 103 S.Ct. 897, a carpentry union alleged that a multiemployer association of building and construction contractors had coerced third parties to enter business relationships with nonunion firms. *See id.* at 520, 103 S.Ct. 897. Plaintiffs alleged that defendants' coercion had an adverse effect on the trade of certain unionized firms and thereby restrained the business activities of the unions. *See id.* at 520–21, 103 S.Ct. 897. The Court concluded that any injuries suffered by the plaintiff "were only an indirect result of whatever harm may have

been suffered by 'certain' construction contractors and subcontractors." *See id.* at 541, 103 S.Ct. 897.

Plaintiff points to *Sanner* as support for the proposition that its own allegations of direct harm are sufficient to withstand a motion to dismiss. Plaintiff purchased physical copper directly from Sumitomo and, in addition, it was injured directly by having to pay higher prices for copper it bought from anyone. Defendant Global distinguishes *Sanner*, arguing that *Sanner* involved a "surgical strike," a one-time direct connection between issuance of the emergency resolution and an immediate impact on soybean prices the next day. In contrast, defendant Global argues, this case involves a conspiracy to manipulate the price of copper over an extended period of time and an effort to hide the fact that prices were being manipulated.

In *Sanner*, the Court of Appeals for the Seventh Circuit distinguished *Associated General Contractors* on the ground that in *Sanner*, the plaintiffs' alleged injury was not "derivative," but rather occurred as an intended result of the adoption and promulgation of defendant's resolution. *See id.* at 929 ("The farmers are not attempting to stand in the shoes of a third party or to complain of the secondary consequences arising from an injury to a third party.") The court determined that futures market participants were not more directly injured than cash market participants and that damages would be neither speculative nor difficult to apportion. *See id.* at 930. *Cf. de Atucha*, 608 F.Supp. at 516 (concluding that "indirect relationship between de Atucha's claim and the alleged violation is a factor" weighing against de Atucha). The fact that this case involves prices that rose over time, and not immediately, as in *Sanner*, does not make the effect of defendants' actions any less direct. Defendants intended to inflate the price of physical copper artificially and, over a period of years, worked to accomplish that goal. As was the case in *Sanner*, the close link between the cash and futures markets makes this "an allegation of a plausible cause and intended effect" unlike the allegation of improper motive that the Supreme Court found insufficient in *Associated General Contractors*. *See Sanner*, 62 F.3d at 929.

Defendants argue that plaintiff lacks antitrust standing because it seeks damages for copper that it purchased from sellers other than defendants. This overlooks the essence of plaintiff's claim: defendants had such power over the copper futures and cash markets that they could cause the exchange prices to rise. Plaintiff alleges that physical copper is priced (by all sellers) with reference to the COMEX price. Therefore, if defendants caused the CO-MEX price to rise, they injured plaintiff every time plaintiff bought physical copper regardless who the seller was. Unless non-conspiring sellers "fully offset the conspiratorial output reduction, the innocent suppliers sell—and all consumers purchase—under the 'price umbrella' spread by the conspirators." 2 Areeda & Hovenkamp at ¶ 372. Therefore, plaintiff should be allowed to recover for its purchases of the same product that defendant sold (physical copper) in the same market. *See id. Gross v. New Balance Athletic Shoe, Inc.*, 955 F.Supp. 242 (S.D.N.Y.1997), does not require a different result. *Gross* held that plaintiffs could not recover for an injury suffered by those who purchased from non-conspiring retailers. *See id.* at 246. It is distinguishable from the present case because in *Gross*, "[n]on-conspiring retailers may have independently raised or maintained their prices for any number of reasons, or may even have lowered their prices." *Id.* In contrast, in this case the cash market price by all sellers is tied directly to the COMEX price. This directness between plaintiff's injury and the market restraint is a factor in plaintiff's favor.

### 4. *Existence of more direct victims*

█ Defendants argue that there are several classes of victims who were injured

more directly than plaintiff, including traders on the LME and on COMEX. Some of these traders have already filed suit against some of the defendants in this case, *see, e.g., In re Sumitomo Copper Litig.*, 995 F.Supp. 451 (S.D.N.Y.1998), making it unlikely that defendants will get away scot-free if plaintiff is not allowed to recover damages. Defendants argue that denying plaintiff a remedy "is not likely to leave a significant antitrust violation undetected or unremedied." *Associated General Contractors*, 459 U.S. at 542, 103 S.Ct. 897. However, denying plaintiff a remedy might result in a less than full remedy for a significant antitrust violation if it means that an intended victim of the conspiracy is unable to receive compensation.

However, this does not dispose of the inquiry. Plaintiff challenges the idea that participants on the LME and COMEX were harmed more directly than plaintiff and points to the court's conclusion in *Sanner* that "[f]utures market participants were not more directly injured than cash market participants because, as [the court had] indicated, both markets were affected by the allegedly anticompetitive conduct." *Sanner*, 62 F.3d at 930. Plaintiff would read *Sanner* as holding that any time two markets are affected by anticompetitive conduct, participants in both markets suffer equally directly injuries. Such a reading is too expansive. It is possible that some participants on one market might be injured but that the injury might not be direct. In this case, however, plaintiff's injury is not derived from that of traders on the futures exchanges but is caused directly by the same increase in futures prices that caused the traders' injury. (The fact that a premium may be added to the COMEX price to obtain the cash price does not make the relationship between the two prices any less direct: if the COMEX price rises, the cash price rises and vice versa.)

Plaintiff's complaint is inconsistent in its allegations about the relationship between the cash price and futures price. In ¶ 18 of the complaint, plaintiff alleges that "[t]he price for futures generally varies directly with the price for physical copper (known as the 'Spot Price'), although the price for futures, which includes financing, insurance costs and storing charges, is generally higher." Later, plaintiff alleges that "prices of copper on the cash market are set by reference to the price (or, in some cases, a monthly average price) of copper futures on the COMEX and, [sic] plus a 'basis' price (a premium factor), determined at the time of contracting." Compl. ¶ 20. Since a basis price is added to the COMEX price to obtain the cash market price, the cash market price must be higher than the futures price. Whether it is the cash price or the future price that is higher, however, plaintiff alleges consistently that the two prices are directly related: when one goes up, so does the other. Furthermore, plaintiff alleges that defendants conspired to raise the price of copper by manipulating the copper futures market; the alleged goal of the conspiracy was to raise the price of physical copper, which was the direct cause of the injury to plaintiff.

### 5. *Speculative nature of the damages*

This factor is related to the indirectness of the injury. *See de Atucha*, 608 F.Supp. at 516. In both *Reading* and *de Atucha*, the courts found the plaintiffs' damage claims to be highly speculative. *See Reading*, 631 F.2d at 13–14; *de Atucha*, 608 F.Supp. at 516. Although it may not be easy to determine the exact damages plaintiff suffered, plaintiff argues that the extent to which defendant's actions led to a rise in the cash market price of copper is objectively verifiable. As the Court of Appeals for the Seventh Circuit noted in *Sanner*, "[a] damages calculation for a market manipulation scheme, though it may require expert testimony, is hardly beyond the ken of the federal courts." *Sanner*, 62 F.3d at 930.

In *Reading*, the court affirmed the entry of summary judgment for defendant, hold-

ing that the relationship among prices for copper futures on the LME, refined copper and copper scrap was too speculative and too attenuated, making it almost impossible for the court to trace "the relative effect of an alleged conspiracy in the market for refined copper on the price of copper scrap." *Reading,* 631 F.2d at 13. However, the present case is before this court on a motion to dismiss; at this stage the allegations of a direct relationship between the prices on the futures and cash markets must be accepted as true. Defendants will have the opportunity to disprove those allegations either at trial or by filing a motion for summary judgment. Assuming there is a direct relationship, damages should not be particularly speculative.

6. *Risk of duplicative recoveries or complex apportionment of damages.*

■ Defendants argue that this factor cautions against finding that plaintiff has antitrust standing, asserting that plaintiff's theory would make defendants liable "to (a) anyone who traded on the LME; (b) anyone who traded on COMEX; and (c) anyone who purchased physical copper in any cash market anywhere in the world, from any seller, during the time the alleged 'master plan' was in effect." Mem. of Law in Supp. of Sumitomo Defs.' Mot. to Dismiss Am.Compl. at 15. Plaintiff responds that its damages are a discrete injury that was not passed on from anyone else and therefore raises no serious risk of duplicative recoveries. If the allegations against defendants are true, defendants intended to injure futures traders and purchasers on the cash markets directly and should be held liable for all the harm caused. Allowing all injured parties to recover in this case would not be duplicative. As discussed above, the injuries were not passed on from one injured person or entity (for example, a trader in copper futures) to another (a purchaser on the cash market). The artificially raised prices were not passed along a chain of distribution. *See de Atucha,* 608 F.Supp. at 514 (noting no danger of duplicative

recoveries in that case). In *de Atucha,* the court noted that de Atucha had named as defendants the other parties to his transactions, such as the brokerage house that placed his trades, further eliminating the possibility of duplicative recoveries. *See id.* Plaintiff has taken the same course. *de Atucha* is not entirely on point because in that case, the plaintiff did not seek to recover for harm suffered on the cash market, but because the cash market price is related to the COMEX price in a way that is unlike the passing on of the rise in COMEX price by a futures trader, plaintiff's claim for damages is not duplicative of the claim of another victim of defendants' manipulations. For the same reason, damages will not be difficult to apportion. *See Sanner,* 62 F.3d at 930.

### B. *Conclusion*

An antitrust standing inquiry involves a "case-by-case analysis of 'the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them.'" *Sanner,* 62 F.3d at 927. The analysis of the relevant factors identified in *Associated General* indicates that plaintiff has alleged facts sufficient to withstand an antitrust standing challenge. Defendants' motion to dismiss the complaint on the basis of plaintiff's lack of antitrust standing will be denied.

### IV. SUFFICIENCY OF ALLEGATIONS AGAINST CREDIT LYONNAIS

Defendant Credit Lyonnais Rouse has moved to dismiss the complaint on two grounds, arguing that the amended complaint does not contain any factual allegations that it engaged in any unlawful conduct and, even if it does, any federal claim against it is time-barred. Defendant argues that plaintiff did not allege facts sufficient to support its claim that defendant Credit Lyonnais was a member of any conspiracy alleged in the complaint and alternatively, that the complaint alleges

two conspiracies and alleges that Credit Lyonnais was a member only of a conspiracy that ended in 1993 so that the claim against it is precluded by the statute of limitations.

## A. *Sufficiency of Allegations*

■ As I have noted, "[d]ismissals at the pleading stage of an antitrust claim should be granted very sparingly, prior to giving the plaintiffs ample opportunity for discovery." *Continental Orthopedic Appliances*, 956 F.Supp. at 373. "[T]o establish an unlawful combination or conspiracy, there must be evidence that two or more parties have knowingly participated in a common scheme or design to accomplish an anti-competitive purpose." *Contractor Utility Sales v. Certain–teed Products Corp.*, 638 F.2d 1061, 1074 (7th Cir.1981) (citing *Albrecht v. Herald Co.*, 390 U.S. 145, 149, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968), and concluding that party resisting directed verdict failed to establish prima facie case of unlawful conspiracy to eliminate it as competitor). Direct evidence of a conspiracy is not necessary: "[t]he requisite concerted action may be inferred from a course of dealing or from other circumstantial evidence." *Id.* (citing *American Tobacco Co. v. United States*, 328 U.S. 781, 809–10, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946)).

Plaintiff alleges in its amended complaint that defendant Credit Lyonnais, as well as all other defendants, "conspired to manipulate and corner and did manipulate and corner the market for physical copper and copper futures." Plaintiff also alleges that defendant Credit Lyonnais made trades and performed other acts in furtherance of the conspiracy. At this point, plaintiff must show only that the alleged conspiracy is subject to generalized proof. *See In Re NASDAQ Market–Makers Antitrust Litigation*, 169 F.R.D. 493, 518 (S.D.N.Y.1996); *Transamerican Refining Corporation v. Dravo Corporation*, 130 F.R.D. 70, 74 (S.D.Tex.1990); *Abrams v. Interco Inc.*, 93 F.R.D. 331, 332 (S.D.N.Y. 1981). Although plaintiff does allege multiple agreements among different participants, it alleges one all-inclusive conspiracy with a single unlawful end: to corner the market for copper futures in order to artificially raise the price of physical copper. If plaintiff can show a single plan, goal or purpose on the part of defendants, it can establish a single conspiracy.

Plaintiff has done more than make bald legal conclusions of a conspiracy; it has alleged facts relating to defendant Credit Lyonnais's willingness to go beyond the ordinary financial services it would be expected to perform as Sumitomo's broker and it has alleged that defendant was a partner of Hamanaka. Plaintiff also alleges that the LME sanctioned Credit Lyonnais for its activities on behalf of Sumitomo, from which it is reasonable to infer that Credit Lyonnais was doing something sanctionable. It is conceivable that plaintiff could prove a set of facts supporting its allegations, from which a conspiracy can be inferred. *See MCM*, 62 F.3d at 977. The detail sought by defendant is not required by Fed.R.Civ.P. 8(a). It can be developed during discovery. *See Hammes*, 33 F.3d at 782; *Three Crown Ltd. Partnership v. Caxton Corp.*, 817 F.Supp. 1033, 1048 (S.D.N.Y.1993).

Defendant Credit Lyonnais argues that plaintiff has not alleged that Credit Lyonnais engaged in any specific unlawful conduct, lumping it together with the other defendants to make general allegations of a conspiracy. Defendant is correct that the complaint focuses primarily on defendants Sumitomo and Global. However, defendant Credit Lyonnais is identified clearly as a defendant. In the complaint, plaintiff alleges specifically that defendant Credit Lyonnais performed trades and other services for Sumitomo, "acted as a 'dummy' for Sumitomo's and Winchester's trading" and was sanctioned by the LME for its role in financing Sumitomo and Winchester. The complaint provides at least minimal notice to defendant Credit Lyonnais of the claim against it.

Standing alone, the allegation that defendant Credit Lyonnais had a financial interest in Winchester's profits and share capital does not require the conclusion that it conspired with Winchester to increase those profits and capital. *See* 6 Phillip E. Areeda, *Antitrust Law* at ¶ 1405 (1986) (evidence that defendants would have a common motive for concerted action merely reflects fact of interdependence and finding of interdependence is not equivalent to finding conspiracy). However, such an allegation may lend support to the possibility that there was an unlawful conspiracy. *See id.* It is not unlawful for defendant Credit Lyonnais to be a financial partner of Winchester; however, plaintiff alleges in addition that defendant Credit Lyonnais "was a partner to Winchester in its wrongful dealings." Compl. ¶ 13. Although a more innocent inference may be drawn from that allegation, a reasonable understanding of the sentence is that Credit Lyonnais participated with Winchester intentionally and assisted it in the alleged conspiracy. A similar inference is reasonably drawn from the allegation that "CLR, which had acted as a 'dummy' for Sumitomo's and Winchester's trading, was not so lucky as its partner Hamanka [sic]." Compl. ¶ 26. The allegation that "CLR made trades and undertook other acts and services for Sumitomo stock which went beyond ordinary financial services and which furthered Sumitomo's unlawful conduct" may reasonably be understood as an allegation that defendant Credit Lyonnais aided intentionally Sumitomo in its unlawful activities. Such an interpretation is consistent with the requirement that, in deciding a motion to dismiss, a court must draw all reasonable inferences in plaintiff's favor.

A more difficult question is whether the same conspiracy continued after Sumitomo's manipulations were halted temporarily in 1993. Plaintiff clearly alleges two stages of manipulation by defendant Sumitomo, one before and one after the LME's emergency action in 1993; defendant Credit Lyonnais argues that the complaint alleges two separate conspiracies. After the LME action in 1993, defendant Sumitomo began working with defendant Global. However, plaintiff alleges that even after a 1993 or later LME investigation into defendant Credit Lyonnais's role and sanctions levied against Credit Lyonnais, "CLR did not withdraw from the conspiracy and continued to conceal until 1997 that it held a financial interest in Winchester." Compl. ¶ 26. Nowhere in the complaint does plaintiff allege a temporal end to Credit Lyonnais's role as Sumitomo's broker. Plaintiff intends to allege one conspiracy that continued after the LME investigation; as long as the general allegations support a finding of one conspiracy and acts are alleged to have been committed by at least one conspirator within four years of filing of the complaint, it does not matter that plaintiff does not allege that Credit Lyonnais committed any specific acts in furtherance of the conspiracy after 1993.

Whether a conspiracy is single or multiple is a question of fact appropriately determined by a jury. *See United States v. Gabriel,* 920 F.Supp. 498, 504 (S.D.N.Y. 1996) (citing *United States v. Johansen,* 56 F.3d 347, 350 (2d Cir.1995)). At this stage, I conclude that plaintiff has met its burden of showing a single conspiracy.

### B. *Statute of Limitations*

Lawsuits under section 4 of the Clayton Act must be brought within four years after the cause of action accrued. *See* 15 U.S.C. § 15b. Plaintiff alleges that defendants Sumitomo and Global committed several overt acts after June 1994 that fall within the statute of limitations for this complaint. *See, e.g.,* Compl. ¶¶ 29, 30, 32, 33. Although "[p]laintiffs cannot avoid the bar of the statute of limitations merely by characterizing each claim as part of a broad ongoing conspiracy continuing into the limitations period," *Argus, Inc., v. Eastman Kodak Co.,* 552 F.Supp. 589, 595 (S.D.N.Y.1982), the preceding discussion shows that plaintiffs have made allegations

sufficient at the motion to dismiss stage to support their allegation of one continuing conspiracy.

I share defendant Credit Lyonnais's concern regarding plaintiff's ability to prove one overriding conspiracy or common goal because plaintiff has alleged that the conspirators' means of achieving their unlawful goal changed over time as a result of investigations by regulatory bodies. However, plaintiff alleges defendants' involvement in a conspiracy to raise the price of copper through manipulation of the copper futures markets. Although different defendants may have been actively involved at different times, and different methods were used to accomplish the goal of the conspiracy, defendants pursued the same goal of manipulating and cornering the market for physical copper and copper futures over the entire time period. Furthermore, as discussed above, plaintiff alleges specifically that Credit Lyonnais did not withdraw from the conspiracy even after it was investigated by the LME in 1993. *See* Compl. ¶ 26. This allegation implies that the same conspiracy continued after 1993.

In denying a motion for judgment of acquittal in a case where the defendants were charged with violating Section 1 of the Sherman Act, the District Court for the Southern District of New York noted, " '[t]here is, of course, no requirement that each coconspirator participate in every phase of an evolving conspiracy, as long as each was aware that the conspiracy did not begin and end with his own activities.' " *United States v. Yonkers Contracting Co., Inc.*, 706 F.Supp. 296 (S.D.N.Y.1989) (quoting *United States v. Heinemann*, 801 F.2d 86, 92 n. 2 (2d Cir.1986)). The court distinguished *United States v. Korfant*, 771 F.2d 660 (2d Cir.1985), a case on which defendant Credit Lyonnais relies and in which the court of appeals found separate conspiracies. As the district court noted, in *Korfant*, where the defendants were charged with fixing grocery prices at supermarkets in Ohio, Connecticut and Mas-

sachusetts, there was no claim that prices in Ohio were related in any way to those in Connecticut and Massachusetts or that consumers in the different markets were aware of prices in the other. *See Yonkers*, 706 F.Supp. at 299; *Korfant*, 771 F.2d at 663 (noting functional independence between agreements to fix prices in two regional markets might be conclusive factor leading to conclusion that there were separate conspiracies). Although technically the two stages of the conspiracy were independent because their success was not mutually dependent, the stages intended to achieve the same goal of increased copper and futures prices by different means. Although it is arguable that plaintiff's complaint shows only a single common actor across time, as was the case in *Korfant*, the relationship between the two possible conspiracies is such as to overcome any inference of multiple conspiracies, especially when considered in light of the liberal pleading requirements of the federal rules. I conclude that plaintiff's claim against defendant Credit Lyonnais is not barred by the statute of limitations.

As the Court of Appeals for the Second Circuit has stated and the Court of Appeals for the Seventh Circuit has quoted approvingly,

> the crucial time for accrual purposes is when the plaintiff becomes aware that he is suffering from a wrong for which damages may be recovered in a civil action. To permit him to wait and toll the running of the statute simply by asserting that a series of separate wrongs were committed pursuant to a conspiracy would be to enable him to defeat the purpose of the time bar, which is to preclude the resuscitation of stale claims.

*Singleton v. City of New York*, 632 F.2d 185, 192 (2d Cir.1980) *quoted in Scherer v. Balkema*, 840 F.2d 437, 440 (7th Cir.1988). However, now is not the appropriate stage in this case to determine which damages were caused by overt acts committed within the limitations period.

## II. RHODE ISLAND STATE CLAIMS

The Rhode Island Antitrust Act must be "construed in harmony with judicial interpretations of comparable federal antitrust statutes insofar as practicable, except where provisions of this chapter are expressly contrary to applicable federal provisions as construed." R.I.Gen.Laws. § 6–36–2(b). R.I.Gen.Laws § 6–36–4 parallels section 1 of the Sherman Antitrust Act. *See ERI Max Entertainment, Inc. v. Streisand*, 690 A.2d 1351, 1353 n. 1 (R.I. 1997). Federal cases interpreting parallel federal provisions are appropriately consulted in interpreting Rhode Island antitrust laws. *See id.* (citing *UXB Sand & Gravel, Inc. v. Rosenfeld Concrete Corp.*, 599 A.2d 1033, 1035 (R.I.1991)). Because I have concluded that plaintiff has stated a claim for relief under the federal antitrust statutes, I will deny defendants' motion to dismiss the Rhode Island claim. The Rhode Island claim forms part of the same case or controversy as the federal claim and does not appear to raise a novel or complex issue of state law. This makes it appropriate for the exercise of supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

## ORDER

IT IS ORDERED that

1. The motion of defendants Sumitomo Corporation of America, Sumitomo Corporation, Sumitomo Futures Corporation, Global Minerals and Metals Corporation and David Campbell to dismiss the complaint for failure to state a claim upon which relief can be granted under Rule 12(b)(6) is DENIED; and

2. The motion of defendant Credit Lyonnais Rouse to dismiss the complaint against it under Rules 12(b)(6) and 12(b)(1) is DENIED.