348

In re COPPER ANTITRUST
LITIGATION

Loeb Industries, Inc., and Los Angeles
Scrap Iron & Metal Corp., on behalf of
themselves and all others similarly situated, Plaintiffs,

v.

Sumitomo Corporation, Global Minerals
and Metals Corporation, Merrill Lynch
& Co., Inc., Merrill Lynch Pierce Fenner
& Smith (Brokers & Dealers), Limited,
and Merrill Lynch International, Inc.,
Defendants.

Metal Prep Company, Inc., on behalf
of itself and all others similarly
situated, Plaintiffs,

v.

Sumitomo Corporation, Global Minerals
and Metals Corporation, Merrill Lynch
& Co., Inc., Merrill Lynch Pierce Fenner
& Smith (Brokers & Dealers), Limited,
and Merrill Lynch International, Inc.,
Defendants.

M.D.L. No. 1303.
Nos. 99–C–377–C, 99–C–468–C.

United States District Court,
W.D. Wisconsin.

Aug. 24, 2000.

William R. Steinmetz, Reinhart, Boerner, Van Deuren, Norris & Rieselbach, S.C., Milwaukee, WI, for Loeb Industries, Inc.

David H. Weinstein, Weinstein, Kitchenoff, etc, Philadelphia, PA, for Los Angeles Scrap Iron & Metal Co.

Arthur M. Kaplan, Fine, Kaplan & Black, Philadelphia, PA, for Metal Prep Company, Inc.

Jon P. Axelrod, Dewitt Ross & Stevens, Madison, WI, for CBS Corp., Emerson Electric Co., Viacom Inc., Westinghouse Electric Corp.

Sanford P. Dumain, Milberg, Weiss, Bershad, Hynes & Lerach, L.L.P., New York City, for Ocean View Capital, Inc.

Robert B. Bernstein, Kaye, Scholer, Fierman, Hays & Handl, New York City, for Metallgesellschaft AG, MGTS UK Holding, Ltd.

Alexandre De Gramont, Crowell & Moring LLP, Washington, DC, for So. Calif. Edison Co. (Prop Interv).

H. Peter Haveles, Jr., Cadwalader, Wickersham & Taft, New York City, for Carl R. Alm, R. David Campbell, Copper Antitrust Litigation, Global Minerals and Metals Corp.

Yasuo Hamanaka, c/o Tokyo Prison, Tokyo, Japan, for Hamanaka, Yasuo

David J. Harth, Foley & Lardner, Madison, WI, for Merrill Lynch & Co., Inc., Merrill Lynch International Inc., Merrill Lynch Pierce Fenner.

Robert Horowitz, Stafford Rosenbaum, LLP, Madison, WI, for Credit Lyonnais Rouse, Ltd.

John F. Cambria, Salans Hertzfeld Heilbronn Christy V, New York City, for Ashley Levett and Charles Vincent.

David R. Cross, Quarles & Brady, Milwaukee, WI, for Sumitomo Corporation, Sumitomo Corporation of America, Sumitomo Futures Corporation.

James H.R. Windels, Davis, Polk & Wardwell, New York City, for J.P. Morgan & Company, Morgan Guaranty Trust Co. of New York.

CRABB, District Judge.

This is a civil action for monetary and declarative relief brought pursuant to the Sherman Act, 15 U.S.C. § 1, and the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1341, 1343 and 1962. (Originally, plaintiffs sought to include in this suit antitrust claims under the laws of 32 states not included in a California state case but they have abandoned both the class's and their own individual state law claims.) Plaintiffs Loeb Industries, Inc., Los Angeles Scrap Iron & Metal Corp. and Metal Prep Company, Inc. contend that defendants Sumitomo Corporation, Global Minerals and Metals Corporation, Merrill Lynch & Co., Inc., Merrill Lynch Pierce Fenner & Smith (Brokers & Dealers), Limited and Merrill Lynch International, Inc. violated state and federal laws by entering into a conspiracy to raise the price of copper to artificially high

levels through manipulation of the copper exchange markets. Presently before the court are plaintiffs' motion for class certification under Fed.R.Civ.P. 23(b)(3) and the motion of defendants Sumitomo Corporation and Global Minerals and Metals Corporation to dismiss the complaint pursuant to Fed. R.Civ.P. 12(b)(6) and 12(b)(1).

Defendants Sumitomo and Global Minerals and Metals oppose the certification of any class, arguing that the proposed class members are not ascertainable, individual issues predominate, the class is hopelessly in conflict and it violates the indirect purchaser prohibition. In their motion to dismiss, these defendants contend that plaintiffs lack standing to sue under the antitrust laws and RICO. (On May 24, 2000, defendants Merrill Lynch & Co., Inc., Merrill Lynch Pierce Fenner & Smith (Brokers & Dealers) Limited and Merrill Lynch International, Inc. withdrew their opposition to plaintiffs' motion for class certification and withdrew their motion to dismiss the complaint.)

I conclude that plaintiffs have not succeeded in showing that this case is one that should be certified as a class action. Plaintiffs are unable to show antitrust standing or the ascertainability of a class. As to defendants' motion to dismiss, plaintiffs' allegations are sufficient to withstand the motion if I consider only the allegations of the complaint and construe the allegations in the light most favorable to plaintiffs. However, I conclude that denying defendants' motion to dismiss would be a waste of the resources of both the court and the litigants. It is clear from the documents considered in connection with the motion for class certification that plaintiffs cannot substantiate many of the allegations of their complaint that are critical to standing and to the ascertainability of a class. Plaintiffs are not prejudiced by this treatment of their motion to dismiss because they have had ample opportunity to respond to the documents produced by defendants and to produce documents of their own.

For the sole purpose of deciding these motions, I find that plaintiffs' complaint fairly alleges the following.

## ALLEGATIONS OF FACT

### I. PARTIES

Plaintiff Loeb Industries, Inc. is a Wisconsin corporation and the corporate successor to both Loeb Industries, Inc. and Lorman Iron & Metal Co., Inc. Plaintiff Los Angeles Scrap Iron & Metal Corp. is a California corporation and plaintiff Metal Prep Company, Inc. is a Pennsylvania corporation. All plaintiffs or, in the case of plaintiff Loeb Industries, its predecessors, purchased physical copper during the class period at inflated prices.

Defendant Sumitomo Corporation is a Japanese corporation that entered into contracts with respect to transactions in physical copper and copper futures or options in furtherance of a conspiracy to raise, fix, stabilize and maintain copper prices at artificially high levels. Defendant Global Minerals and Metals Corporation is a copper merchant firm with its principal place of business in New York, New York. Global had close ties with defendant Sumitomo and manipulated copper transactions by entering into a series of supply contracts with defendant Sumitomo between 1994–1996. Defendant Merrill Lynch & Co., Inc. is a holding company organized under the laws of Delaware, with offices in New York. Defendant Merrill Lynch Pierce Fenner & Smith (Brokers & Dealers), Limited, is a British corporation with its principal place of business in London, England and is a wholly owned subsidiary of Merrill Lynch & Co. Defendant Merrill Lynch International, Inc., is a corporation that maintains offices in New York City and London, England and is a wholly owned subsidiary of Merrill Lynch & Co.

### II. CLASS ACTION ALLEGATIONS

Plaintiffs propose the following class:

All copper or metals dealers and other entities in the United States that purchased physical copper during the period from June 1994 through June 15, 1996, in commercial quantities at prices expressly related to LME or Comex copper future prices. Excluded from the Class are all claims by any of the defendants or their affiliates, all claims by governmental enti-

ties, and all claims released in settlement of other class action litigation.

Plaintiffs define "physical copper" as copper that is purchased

and sold in commercial quantities either as primary copper or as scrap copper. Primary copper has been freshly melted or refined. Scrap copper has been previously used and is generally described as No. 1 Copper, which does not necessarily require refining, or as No. 2 scrap copper, which generally does require refining. For purposes of this complaint, "physical copper" means primary copper (including new mined, refined copper and other refined copper), No. 1 scrap copper, and No. 2 scrap copper. It does not include other copper products.

Plaintiffs would exclude from the proposed class purchasers who paid a price derived from the price that a prior purchaser had paid for the physical copper, because the price of such purchases was not expressly related to LME or Comex futures prices.

Plaintiffs and their counsel intend to prosecute this action vigorously. Plaintiffs' counsel are knowledgeable and experienced in antitrust class litigation. The individual damages of each class member are relatively small in comparison to the complexity and cost of pursuing this antitrust and RICO litigation against defendants.

### III. COPPER MARKET

The prices of primary copper and scrap copper are linked structurally and closely to each other and to the London Metal Exchange (LME) and Comex prices for copper futures and options. (In this opinion, I use "futures" as it is used in the complaint, to refer to both forward contracts and future contracts, as well as to related put and call options and spot prices.) Almost all transactions in primary copper in the United States are priced with reference to the Comex copper futures price. Almost all transactions in No. 1 and No. 2 scrap copper in the United States are priced at a stated discount from or premium over the Comex copper futures price. Therefore, at all relevant times, the Comex copper futures prices were price indices for purchases of physical copper, includ-

ing primary copper and No. 1 and No. 2 scrap copper. Because of this market-driven, interlocking price structure, the prices for copper futures and options could not be effectively raised, fixed or stabilized without effectively raising, fixing and stabilizing the prices for physical copper, including both primary and scrap copper.

At all times relevant to this action, there were well established and well known pricing relationships between the LME and the United States futures and physical copper markets. LME copper prices strongly influenced Comex copper prices for numerous reasons, including the much larger size of the LME volume compared to that of Comex, the earlier opening of the LME in London compared to Comex in New York and the less stringent regulation of LME trading compared to CFTC regulation of Comex. Arbitrage trading between the LME and Comex brought Comex prices higher than they otherwise would have been. LME and Comex prices tend to be equivalent because traders generally have access to both exchanges and will utilize whichever of the two provides the best price for any given transaction. Because physical copper (including both primary and No. 1 and No. 2 scrap copper) is almost always priced by reference to the LME or Comex price, the defendants' manipulation necessarily, foreseeably and intentionally caused artificial and inflated pricing in the physical copper markets.

In December 1995, the Commodity Futures Trading Commission began an investigation into abnormal conditions and activities in the copper markets. The commission found that defendant Sumitomo had violated §§ 6(c), 6(d) and 9(a)(2) of the Commodity Exchange Act, 7 U.S.C. §§ 1–25, and imposed remedial sanctions. Later, Sumitomo settled class actions asserting certain claims on behalf of people who traded copper futures and on behalf of people in 18 states and the District of Columbia who purchased primary copper. Additionally, defendant Global settled class actions asserting claims on behalf of people who traded copper futures and on behalf of certain people in 18 states and the District of Columbia who purchased primary copper.

## IV. DEFENDANTS' ANTICOMPETITIVE CONDUCT

Beginning no later than September 1993 and until on or about June 15, 1996, defendants Sumitomo and Global entered into and engaged in a contract, combination and conspiracy whose purpose was to raise, fix, maintain and stabilize the prices of copper at artificial levels and the necessary, intended and foreseeable effect of which was that prices of copper futures and physical copper, including both primary and scrap copper were raised, fixed, maintained and stabilized. Defendant Merrill Lynch joined the contract, combination and conspiracy as an active participant and co-conspirator no later than in or about September 1995. By purchasing and holding massive market positions in physical copper and copper futures before and during the class period, Sumitomo, in agreement, combination and conspiracy with Global and Merrill Lynch, had the ability to influence market prices of copper. Defendants intended that Sumitomo would acquire and maintain a dominant and controlling position in both the physical supply of deliverable warehouse copper stocks of the LME and Comex and in maturing LME and Comex futures positions. Defendants intended to create artificially high prices and artificially high and distorted premiums of nearby prices over futures prices.

Beginning in 1993, Sumitomo and Global entered into a series of supply contracts in which Sumitomo agreed to purchase copper from Global on a monthly basis during 1994 through 1997. These supply contracts allowed Sumitomo and Global to claim that they had a legitimate and genuine commercial need to obtain physical copper and to establish excessive copper forward positions to "hedge" this purported commercial need. Sumitomo and Global did not have a commercial need for physical copper in the amounts represented by the supply contracts. Instead, Sumitomo and Global acquired excessive copper forward positions for the purpose of increasing copper prices and copper spreads to artificial levels. By the early 1990's, Sumitomo was one of the world's largest physical copper traders, buying approximately 500,000 metric tons of physical copper per year and selling a like quantity. This amount equaled approximately 5% of the world's total annual copper production. During the class period, defendants actively traded copper futures on both the LME and Comex. During spring 1995, Sumitomo virtually doubled its large Comex long position from 2,000 contracts to 4,000 contracts. On June 1, 1995, Sumitomo held 3,800 long contracts, representing approximately 10 percent of the total long position in regularly traded Comex copper futures. Sumitomo had no legitimate business need for these futures, but purchased them to inject artificial demand into the market even while defendants were constricting supply. These long contracts entitled Sumitomo to require the "shorts" to deliver, at contract maturity, 47,500 tons of copper from Comex warehouses, even though the total amount of such stocks was only 6,293 tons. At various times during the class period, defendants acquired and held nearly all of the warrants for physical copper in LME and Comex warehouses.

During the class period, defendants stood to gain as much as one billion dollars or more in profits from their manipulations. Defendants' dominance and control of physical stocks and maintenance of large futures positions persisted into the spring of 1996. Plaintiffs and proposed class members paid artificially inflated prices to purchase physical copper because of defendants' unlawful, conspiratorial conduct. This injured plaintiffs in their business and property and caused plaintiffs to suffer damages. Because of the self-concealing nature of defendants' conspiracy and defendants' various acts of concealment, plaintiffs could not reasonably detect defendants' wrongful conduct or its impact upon the business or property of plaintiffs and the members of the proposed class. During the class period, plaintiffs were ignorant of defendants' wrongful conduct and its impact on plaintiffs. During the class period, the copper prices on the LME and Comex reflected the information available. Defendants made false statements to copper exchange officials and governmental regulators during the class period to artificially increase prices for both physical copper and copper futures on the LME and Comex while concealing the import of defendants'

conduct. Defendants also spread false rumors and made false statements to various market participants to induce them to buy or to refrain from selling copper futures and similar contracts.

After Sumitomo announced the firing of its head copper trader in or about June 1996, defendants' market control began to decline. Primary copper prices dropped from highs of approximately $2,800 per ton to below $2,000 per ton after the announcement. Scrap copper prices crashed comparably. The lower price levels persisted for months thereafter.

## OPINION

### I. MOTION FOR CLASS CERTIFICATION

#### A. *Analyzing Motions for Class Certification*

Fed.R.Civ.P. 23 requires a two-step analysis to determine whether class certification is appropriate. *See Rosario v. Livaditis*, 963 F.2d 1013, 1017 (7th Cir.1992). First, plaintiffs must satisfy the four prerequisites in Rule 23(a): (1) the class is so numerous that joinder of all members is impracticable (numerosity); (2) there are questions of law or fact common to the class (commonality); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality); and (4) the representative parties will fairly and adequately protect the interests of the class (adequate representation). *See id.;* Fed.R.Civ.P. 23(a). If the four threshold requirements set forth in Rule 23(a) are met, plaintiffs must satisfy at least one of the three subdivisions of Rule 23(b). Plaintiffs are focusing on subdivision (b)(3), contending that they can show that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R.Civ.P. 23(b)(3).

■ Implicit in Rule 23 is the requirement that the plaintiffs and the class they seek to represent have standing. This is a " 'threshold requirement for the maintenance of a federal class action and must be considered in addition to the requirements of Rule 23.' " *Rozema v. Marshfield Clinic*, 174 F.R.D. 425, 432 (W.D.Wis.1997) (quoting 7B Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, *Federal Practice and Procedure*, § 1785.1, at 139 (2d ed.1986)). The second implicit requirement is that "a proposed class definition must be precise, objective and presently ascertainable," *id.* at 431 (citing *Manual for Complex Litigation* § 30.14 (3d ed.1995)). "The proposed class definition[ ] must not depend on subjective criteria or the merits of the case or require extensive factual inquiry to determine who is a class member." *Id.* (citing *Hardy v. City Optical, Inc.*, 39 F.3d 765, 771 (7th Cir.1994); *Adashunas v. Negley*, 626 F.2d 600, 603 (7th Cir.1980)).

■ The determination whether to certify a class "usually should be predicated on more information than the complaint itself affords." 7B Wright, *supra,* § 1785, at 107, 119 (2d ed.1986). *See also id.* at § 1785, p. 16 (2d ed. Supp.2000) (citing *Castano v. American Tobacco Co.*, 84 F.3d 734, 744 (5th Cir.1996)) ("A district court certainly may look past the pleadings to determine whether the requirements of rule 23 have been met. Going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues."). This makes the analysis quite different from the one employed in deciding a motion to dismiss, in which only the facts alleged in the plaintiffs' complaint can be considered and those allegations must be construed liberally in plaintiffs' favor.

It has become clear from reading the parties' briefs, the depositions of the class representatives and the various expert reports that despite the fact that plaintiffs can satisfy many of the prerequisites of Rule 23, a number of insurmountable obstacles stand in the way of class certification. The problems tend to be interrelated: trying to determine how to ascertain the class members throws into relief the potential complexities and difficulties of administering a class action along the lines envisioned by plaintiffs and high-

lights the impracticability of distinguishing the directly injured parties from the indirectly injured ones. In turn, this suggests the possibility of a class that expands the concept of a class beyond recognition and raises the specter of ruinous awards against defendants far beyond the remedial purposes of the antitrust laws.

As plaintiffs have maintained throughout this litigation, they are not suing defendants for price fixing involving a conspiracy to raise prices on particular products. The scheme they allege is different because it did not affect the prices at which defendants sold a product but the prices on the futures exchanges that determined the price at which products were sold by other persons and entities. Thus, they argue, this is not a case governed by *Illinois Brick Co. v. Illinois,* 434 U.S. 881, 98 S.Ct. 243, 54 L.Ed.2d 164 (1977), in which the only persons who have standing to sue are those who bought the product directly from the manufacturer that raised the price illegally. Rather, the persons who have standing to sue in this case are those who bought certain grades of copper from any source and paid higher prices than would have been charged without the conspiracy. Plaintiffs maintain that anyone who paid more for copper because of the conspiracy on any day that the conspiracy was ongoing was harmed directly by defendants' actions, in contrast to the indirect harm suffered by the building owners in *Illinois Brick* who paid more for their buildings because of the anticompetitive price of the concrete blocks bricks sold to the masonry contractors.

### B. *The Copper Market*

Many of the difficulties plaintiffs face in succeeding on their motion for class certification are inherent in the nature of the copper business. Not only is copper sold along a distribution chain, as are concrete blocks, but because of its significant intrinsic value, the same ingot or roll of wire may be sold many times over, not necessarily in the same form. A manufacturing company that buys a load of copper for a one-time use may sell the excess to another manufacturer or a scrap dealer. That same scrap dealer will resell the excess copper, perhaps to another scrap dealer, who

will repeat the sale. A refiner will buy used or newly mined copper for refining and resale. On any given day, individuals and entities are selling and reselling copper throughout the United States. If these transactions were charted, the result would not be the usual distribution chart of products showing downward movement from manufacturer to distributor to wholesaler to retailer to customer but one showing downward, sideward and upward movements of copper passing downward from miner to smelter refiner to manufacturers and traders of refined copper and sidewards from trader to trader and from them to semi-fabricators to users who sell eventually to scrap dealers, who sell to each other (sidewards) and back up the chain to refiners.

As the copper moves back and forth or up and down, new pricing decisions accompany each move. The record does not reveal exactly how each of these is made, but the deposition testimony of plaintiffs' employees indicates that a number of factors enter into the decision. Basic economics suggests that if the miner pegs the price of its newly mined copper to the price set by the futures exchanges, the smelter will tie the price it charges its purchaser to the futures exchange *as well as* to the price it paid for the ore, plus the costs it incurred in the smelting operation, plus profit. In other words, the smelter will be incorporating a new anticompetitive overcharge (reflecting defendants' manipulation of the market) and at the same time "passing on" the anticompetitive price it had to pay the miner. If the smelter determines its sale price by reference to the exchange *and* to the price it paid for the ore (which includes one overcharge), then the refiner-purchaser will pay for two overcharges. If both it and the smelter are allowed to sue, defendants could be liable for antitrust damages twice with respect to the same copper ore. If the refiner repeats the process in arriving at its price, then defendants' potential liability increases threefold for the same copper.

### C. *Standing*

■ Although ascertainability and standing are inextricably linked in this case, it makes sense to start with standing, which for

antitrust purposes is distinct from standing under Article III. In both instances, the plaintiffs asserting standing must show an injury in fact but in antitrust cases, "the court must make the further determination whether the plaintiff is a proper party to bring a private antitrust action." *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 535 n. 31, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). This determination requires an examination of the connection between the asserted wrongdoing and plaintiffs' claimed injury (which must be attributable to the "anti-competitive aspect of the conduct under scrutiny," *see Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 334, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990)). Only those who are in the best position to vindicate the alleged violation have standing to sue. *See Blue Cross & Blue Shield v. Marshfield Clinic,* 881 F.Supp. 1309, 1315 (W.D.Wis. 1994). In deciding whether a particular plaintiff or class of plaintiffs is a proper party to bring an antitrust action, the court must find that defendants' antitrust violations have caused injury-in-fact to plaintiffs' business or property; the injury is not too remote or duplicative of the recovery of a more directly injured person; the injury is one that the antitrust laws were intended to prevent and flows from defendants' illegal conduct and that the damages claimed measure the injury in a reasonably quantifiable way. *See* II Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 360 (rev. ed.1995). *See also Associated General Contractors,* 459 U.S. at 537–45, 103 S.Ct. 897.

■ The first standing factor presents no problem to plaintiffs. They have alleged facts sufficient to show that their businesses were harmed when they had to pay more for their copper purchases than they would have had it not been for defendants' malefaction and they suffered an "injury-in-fact" because of the antitrust violation. Although defendants deny that plaintiffs could show an injury-in-fact because of the difficulty in proving first, that defendants manipulated the LME; second, that the Comex was affected in the same way by virtue of the LME manipulation; and third, that the higher futures prices affected the prices that defendants

had to pay on the cash market for copper, plaintiffs have adduced evidence sufficient to show that there is a correlation sufficient to suggest a causal connection between defendants' alleged violations and resulting harm to plaintiffs in having to pay higher prices for copper and defendants' intent to raise the prices of copper futures and physical copper. As plaintiffs' expert explains, techniques such as regression analysis enable economists to track correlations of the kind plaintiffs are alleging.

Proximity, or directness of the injury, is plaintiffs' major stumbling block. The difficulty is not the usual one of being the second, third or fourth purchaser in a vertical distribution chain that passes along an anticompetitive price established by the producer or manufacturer, *cf., Illinois Brick,* 434 U.S. 881, 98 S.Ct. 243, 54 L.Ed.2d 164 (concrete block manufacturers conspired to raise prices on block; contractors who bought from manufacturers had standing to sue but others in distribution chain did not), but it is not so different from it that plaintiffs can avoid the Supreme Court's strictures on suing. In both instances, there are concerns that the intervening causes affecting the plaintiffs become so numerous that tracing causation and measuring injuries becomes inordinately complex, that allowing relatively remote plaintiffs to sue would result in damages far in excess of those necessary for deterrence purposes and that allowing these plaintiffs to sue may result in duplicative recovery.

In two major decisions on standing, *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), and *Illinois Brick,* 434 U.S. 881, 98 S.Ct. 243, 54 L.Ed.2d 164, the United States Supreme Court explained antitrust standing in private civil actions brought to enforce the Sherman Act under § 4 of the Clayton Act, 15 U.S.C. § 4. As the Court noted later in *Associated General Contractors,* 459 U.S. 519, 103 S.Ct. 897, a literal reading of the Clayton Act could "encompass every harm that can be attributed directly or indirectly to the consequences of an antitrust violation." To avoid such an outcome, the Court held in *Hanover Shoe* that an antitrust violator could not use passing on as a de-

fense. In other words, the violator could not avoid liability by arguing that the direct purchasers incurred no injury because they passed on any overcharges to their own purchasers. The direct purchasers were injured in their property when they were induced wrongfully to pay an increased price. *See id.* at 489, 88 S.Ct. 2224. Even if the direct purchaser was able to pass on the increased price, "the price he pays the seller remains illegally high." *Id.* This conclusion followed from earlier decisions. *See, e.g., Southern Pacific Co. v. Darnell–Taenzer Lumber Co.,* 245 U.S. 531, 533–34, 38 S.Ct. 186, 62 L.Ed. 451 (1918) ("The general tendency of the law, in regard to damages at least, is not to go beyond the first step. As it does not attribute remote consequences to a defendant so it holds him liable if proximately the plaintiff has suffered a loss."), quoted in *Hanover Shoe,* 392 U.S. at 489 n. 8, 88 S.Ct. 2224. The difficulties in tracing an overcharge through to an indirect purchaser and showing that a particular party in the distribution chain could not or would not have raised its prices in the absence of the initial overcharge convinced the Court that the purposes of antitrust law would not be furthered by recognizing passing on as a defense to antitrust liability.

In *Illinois Brick,* the Court made its ruling symmetrical, holding that indirect purchasers could not use passing on to show that they had been injured. The Court noted that it had rejected the passing on defense in *Hanover Shoe* because of its "unwillingness to complicate treble damages actions with attempts to trace the effects of the overcharge on the purchaser's prices, sales, costs, and profits, and of showing that these variables would have behaved differently without the overcharge." *Illinois Brick,* 431 U.S. at 725, 97 S.Ct. 2061. The Court concluded that the same concerns applied when indirect purchasers tried to sue. It would be just as time consuming and complex to trace the effect of a cost of a particular factor of production when the evidence was introduced by a plaintiff as it would be when it was introduced by a defendant. *See id.* at 731, 97 S.Ct. 2061.

Plaintiffs have emphasized repeatedly that every purchaser of primary copper or No. 1 or No. 2 scrap copper is injured directly when the price it pays is influenced by defendants' allegedly anticompetitive behavior. They have now proposed to exclude from the class purchasers who paid a price derived from the price that a prior purchaser had paid for the physical copper "because the price of such purchases (if any) was not expressly related to LME or Comex futures prices." *See* Plts.' Consolidated Amended Cpt., dkt. # 73, at ¶ 19. Plaintiffs suggest that if the price was derived from a prior purchaser's price, it would both constitute the passing on of damages and would flunk the requirement that the price paid must be related expressly to the LME or Comex futures price. However, they confuse the issue by asserting in their reply memorandum, dkt. # 64, that they are not excluding any sales in which both the prior purchase and the instant purchase were tied to futures prices. If the Comex and LME indexes were still being manipulated at the time of that second sale, the overcharge represents a **fresh** and independent injury. In other words, recovery depends on proof that the price was expressly related to the Comex or LME index, and on proof that the Comex and LME indexes were higher than they would have been absent the conspiracy **at the time of that** particular purchase.

*Id.* at 65 (emphases in original). Plaintiffs do not explain how this proposition eliminates the passing on problem or squares with the suggestion in the record that all copper prices are related expressly to the exchange prices *and* derived from the price the seller paid (because the seller wishes to make a profit).

Plaintiffs' proposal (but not their statements in their brief) acknowledges by implication that *Illinois Brick* presents problems for them and that even if the two cases proceed on distinct theories, plaintiffs cannot avoid *Illinois Brick's* limitations on antitrust recovery. As plaintiffs' explanation makes clear, many of the putative class members have been injured both directly, when they are forced to pay an overcharge because of the manipulations of the exchanges, and indi-

rectly, when they are forced to pay a previous overcharge the seller incurred. Unless the derivative injuries can be separated from the direct, plaintiffs will be seeking duplicative antitrust damages, in violation of *Illinois Brick*. Plaintiffs offer no suggestion for preventing this from happening, short of engaging in the excessively complicated and time consuming task of separating those costs. This is a job that would exceed in scope whatever complexities the Court envisioned in *Hanover Shoe* or *Illinois Brick* and it shows forcefully that neither the named plaintiffs nor the class they seek to represent are proper parties to bring a private civil antitrust action against defendants.

It is no answer to say as plaintiffs do that the complex task of determining damages for individual class members can be handled by simply decertifying the class for that purpose. The problem is precisely the one identified by the Supreme Court in *Hanover Shoe* and *Illinois Brick*: "the uncertainties and difficulties in analyzing price and output decisions 'in the real economic world rather than an economist's hypothetical model' and of the costs to the judicial system and the efficient enforcement of the antitrust laws of attempting to reconstruct those decisions in the courtroom." *Illinois Brick*, 431 U.S. at 732, 97 S.Ct. 2061. Cognizable injury and reasonably quantifiable damages are prerequisites for antitrust standing. *See* II Areeda & Hovenkamp, *supra*, ¶ 360c5.

The umbrella theory of antitrust damages under which plaintiffs are proceeding does not immunize them from having to establish the directness of their injury. The "umbrella theory" is the idea that persons can be injured by a "price umbrella" spread by antitrust violators. *See* II Areeda & Hovenkamp, *supra* ¶ 372. *See also Sanner v. Board of Trade of City of Chicago*, 62 F.3d 918 (7th Cir.1995), and *Amarel v. Connell*, 102 F.3d 1494 (9th Cir.1996). In *Sanner*, soybean farmers were allowed to bring an antitrust action against the Chicago Board of Trade, alleging that a conspiracy had prompted the board to pass a resolution that caused a precipitous drop in soybean cash crop levels and to maintain the artificially depressed levels. Plaintiffs alleged that they were injured by the conspiracy because they had either refrained from selling their soybeans or sold them at illegally depressed price levels. The court of appeals held that the plaintiffs had no cause of action with respect to their claim that they refrained from selling because of the difficulties in establishing causation but that the plaintiffs who were claiming damages caused by selling at a depressed price could proceed. Such a sale "establishes discernible injury in a manner in which a failure to sell cannot." *Id.* at 924. These plaintiffs had antitrust standing, that is, they were proper parties to bring a private antitrust action. *See id.* at 926. The court was satisfied that there was a direct link between the alleged illegal resolution and the farmers' loss even though the resolution's effect was on the futures market and plaintiffs' loss came in the cash market. "Since one market tends to move in lockstep with the other, participants in the cash market can be injured by anticompetitive acts committed in the futures market." *Id.* at 929. *See also Amarel*, 102 F.3d 1494 (rice growers' allegations that they had been injured by low prices caused by defendants' predatorily low prices and restraint of trade had antitrust standing).

Distinguishing *Sanner* and *Amarel* from this case is the fact that the only persons seeking to sue were the first line of persons injured, that is, the plaintiffs who had to sell their crops at reduced prices on the cash market. There was no evidence that the plaintiffs were re-purchasing soybeans and re-selling them to others who were seeking damages as well. No one else who purchased soybeans and then resold them claimed to have suffered an injury caused by defendants' manipulation of the market. Causation was not in doubt, the plaintiffs were not "remote" and damages would be relatively easy to determine. In this case, by contrast, the complexities of the copper transactions in which plaintiffs engaged make it far more difficult to determine whether they or any members of their proposed class were injured directly by defendants' antitrust violations and not just by the passing on of prior overcharges tied to the futures market.

There may be purchasers of copper who qualify as directly injured persons because they can show that the prices they paid for copper did not include any pass on damages from other injured persons. Plaintiffs have not identified any yet, although it has made a number of efforts to do so, as described in more detail in the following section. Obviously, the participants in the futures market qualify as direct victims. They are proceeding with a suit in the United States District Court for the Southern District of New York. Other plaintiffs have brought suits against defendants. Thus, this is not a situation in which a significant antitrust violation will go undetected or unremedied if plaintiffs and their class are not allowed to proceed. *See Associated General Contractors*, 459 U.S. at 542, 103 S.Ct. 897.

### D. *Ascertainability*

■ Although plaintiffs have tried to narrow the class and the scope of damages, they have neither shown how their proposal would work in practice nor solved the problem of ascertainability, that is, how to define an identifiable class. Plaintiffs' suggested definition falls far short of communicating to copper purchasers what they need to know to decide whether they are in or outside the proposed class. Complicating the decision is the uncertainty of what transactions would be included. Unlike a class defined as "persons who bought Product X at any time between such and such dates," a copper purchaser would have to figure out not only whether it is a "copper or metals dealer" or other entity that purchased "physical copper" during the relevant time but also whether any or all of its purchases were "at prices expressly related to LME or Comex copper future prices." There is no definition provided for the term "expressly related," leaving the purchaser without guidance in determining whether its purchases fell into that category. Plaintiffs have not explained how a purchaser would know whether the price it paid was one determined by the futures price or by the amount the seller wanted to obtain in order to make a profit. There may be contracts in which the sale price of copper is pegged specifically to the futures price; even in such cases, there would be no way that the

purchaser could know whether the seller had bought the copper it is selling at a price determined by the futures exchange unless the contract relates to the sale of newly mined copper ore. Certainly, in the absence of such a document, there is no obvious way in which a purchaser could prove how the seller had set the price for any particular purchase.

Adding to the difficulty of ascertainability is defining the copper at issue in a comprehensible way. In their various briefs in opposition to class certification, defendants argue that the identification of the product is too imprecise to communicate to injured plaintiffs that they may be class members. Plaintiffs have defined the copper at issue in paragraph 34 of their consolidated amended complaint filed on January 25, 2000:

> Primary copper has been freshly smelted or refined. Scrap copper has been previously used and is generally described as No. 1 copper, which does not necessarily require refining, or as No. 2 scrap copper, which generally does require refining. For purposes of this complaint, "physical copper" means primary copper including newly mined, refined copper and other refined copper, No. 1 scrap copper, and No. 2 scrap copper. It does not include other copper products.

Defendants contend that the terms used are not commonly understood in the copper market. Plaintiffs have not submitted affidavits or deposition testimony from anyone in the industry that would support their claim that "primary copper" has any more specific meaning than "physical copper." They have cited only one written resource, Gunter Joseph, *Copper—Its Trade, Manufacture, Use, and Environmental Status* (1999), in which the author says that "refined copper" includes "new copper" derived from mines, "which is called 'primary copper,'" *id.* at 21, and that "other refined copper" is copper "refined from recycled scrap." *Id.* In addition, they point out that the term "physical copper" was used by the Commodities Futures Trading Commission in its actions against defendants and by defendant Sumitomo itself in actions it filed against J.P. Morgan & Co. and Chase Manhattan Bank, al-

though they fail to mention that the term was not used to identify a specific kind of copper. In an effort to narrow the definition, plaintiffs advised defendants by letter dated February 21, 2000, that the term excludes certain copper products such as wire.

In response, defendants have submitted the declaration of an expert witness, Leons Kovisars, who declares that his experience in the copper industry has led him to believe that the term primary copper is used typically in the industry to refer to newly mined copper, as opposed to copper that has been refined, and that the term "freshly refined" is not used in the industry to describe copper. In addition, Kovisars says that the term "physical copper" is generally used to refer to all kinds of copper products, including copper and high copper alloy wire, cable, strip sheet, plate, rod, bard, tube and pipe. *See* Decl. of Leon Kovisars, dkt. # 52, at ¶ 6. Also, defendants cite the testimony given on behalf of LA Scrap by an employee of one of the three proposed class representatives. Sergio Alvarez testified that "freshly refined copper" refers to any copper product that is pure copper, including wire, ingots, tubing, sheets and foil. Dep. of Sergio Alvarez, Exh. # 2 to Haveles Affid., Dkt. # 50, at 31, In. 8–32, In. 11. Neal Loeb from Loeb Industries, Inc., was unable to define refined copper, *see* Dep. of Neal Loeb, Exh. # 1 to Haveles Affid., at 11, In. 6–12, In. 23; as was Jeffrey Thalheimer of Metal Prep, *see* Dep. of Jeffrey Thalheimer, exh. # 3 to Haveles Affidavit, at 6, Ins. 4–18, 70, Ins. 9–11. Finally, in their reply brief, dkt. # 64, plaintiffs quote a reference book relied on by defendants, in which the author uses "primary copper" to refer to copper from mines. *See* Raymond F. Mikesell, *The Global Copper Industry* at 56 (1988).

It is largely irrelevant whether either physical copper or primary copper is a term used in the copper industry. The question is whether either one conveys sufficient meaning to enable persons hearing it to determine whether they are members of the class plaintiffs wish to represent. The parties' submissions raise significant doubts about this aspect of the ascertainability of the membership of the class.

Ascertainability is not a problem limited to the determination of damages so that it could be solved by decertifying the class after the questions of liability have been resolved. Rather, it goes to the heart of the question of class certification, which requires a class definition that is "precise, objective and presently ascertainable," *Rozema,* 174 F.R.D. at 431. Otherwise, it is not possible to give adequate notice to class members or to determine after the litigation has concluded who is barred from relitigating.

In plaintiffs' reply memorandum in support of their motion for class certification, they argue that determining the class members is a simple task:

> As Defendants' expert Kenneth Cone explains, copper must be "mined, smelted and refined (or else processed by solvent extraction and electrowinning)" before it is made into copper parts. The major copper producing companies operating in the United States "own at least some facilities in all stages up to and including refining." Cone explains that these companies are not integrated into manufacturing, so copper always changes hand at this stage. It is the purchasers at this stage of the process who, along with purchasers of scrap copper[,] comprise the members of the Class.

Plaintiffs' additional explanation does not resolve the problem of determining the members of the class. First, this is a wholly new definition of class membership that would be limited to manufacturers who buy only from the major copper producing companies and only at a specific stage in the copper processing chain, plus scrap dealers. Second, plaintiffs have not identified the major copper producing companies or what stage of copper processing is included. Third, it makes the conjunction of "purchasers of primary copper" and scrap dealers even more inexplicable than before. There is no obvious logic to plaintiffs' attempt to establish a narrow definition of the purchasers of primary copper while including in their proposed class scrap dealers who buy every form of copper from anyone. Merely emphasizing the close structural relationship between primary and scrap copper is not enough. Plaintiffs must show

that both the persons who deal in scrap and those who purchase primary copper have antitrust standing and can be identified.

Plaintiffs' proposal to limit the class membership to persons who did not pay prices derived from the price that a prior purchaser had paid for physical copper does not lessen the complexity of ascertaining membership. Instead, it adds to it by postulating an incomprehensible test.

With this conclusion that the proposed class cannot meet the critical requirements of antitrust standing and ascertainability of a class, there is no need to discuss the specific requirements of Rule 23(a) and (b). Without standing and without an ascertainable class, plaintiffs cannot prevail on their motion for class certification. Even if they had met those requirements, the benefits of a class action are outweighed by the extraordinary complexity of the class action litigation that plaintiffs have proposed and the possibility of ruinous damages that would follow from allowing thousands of people to sue for treble damages for thousands or hundreds of thousands of transactions taking place over the 500 days of the alleged conspiracy.

## II. MOTION TO DISMISS

In considering a motion to dismiss for failure to state a claim, the court must accept as true the well-pleaded factual allegations in the complaint, drawing all reasonable inferences in favor of the plaintiff. *See Hishon v. King & Spalding,* 467 U.S. 69, 72, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). It is not permissible to consider facts outside the four corners of the complaint. Following that course in this case would lead to denial of the motion to dismiss for most of the same reasons set out in *In re Copper Antitrust Litigation (CBS Corp. v. Sumitomo Corp.),* M.D.L. Dkt. No. 1303 (W.D.Wis. July 7, 2000) and *In re Copper Antitrust Litigation (Ocean View Capital, Inc. v. Sumitomo Corp. of America),* 98 F.Supp.2d 1039 (W.D.Wis. 2000). Plaintiffs' allegations are sufficient to show that they have standing because they suffered an injury of a type Congress sought to redress with the antitrust laws; plaintiffs' allegations indicate that they are not indirect

purchasers under the umbrella theory of liability.

Reaching the conclusion that plaintiffs' allegations are sufficient to state a claim requires that I ignore the evidence adduced by both sides in litigating the issue of class certification. This is correct, but nonsensical. It has become clear that plaintiffs' allegations do not reflect the actual copper market and, in particular, the kinds of transactions in which plaintiffs engage. Plaintiffs' allegations of direct injury are belied by the deposition testimony of their employees to the effect that plaintiffs bought and sold copper regularly and based their pricing decisions on a myriad of factors, one of which was the futures market. When they sold, they passed on to the buyer any overcharge they had had to pay for the copper they were selling. When they bought, they were forced to pay the overcharge the seller had had to pay, as well as any overcharge the seller added to the lower price it would have charged but for the market manipulation.

Plaintiffs have no written documentation that they relied on the futures markets for any part of their pricing decision. However, their representatives testified that they did and it seems likely that their testimony is correct in that respect. The difficulty is that there is no readily discernible way to separate that part of the pricing decision from the decision to pass along any overcharge already incurred and therefore, no way to insure that defendants are not liable for duplicative and extraordinary damages.

### C. *Standing under RICO*

Defendants argue that plaintiffs' RICO claims fail because the antitrust standing requirements apply equally to the RICO statute. As discussed in *In re Copper Antitrust Litigation (CBS),* No. MDL 1303, slip op. at 41–42, the Court of Appeals for the Seventh Circuit has applied to RICO claims the *Associated General Contractors of California, Inc.,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723, approach to remote injuries. *See International Brotherhood of Teamsters v. Philip Morris,* 196 F.3d 818, 825–26 (7th Cir.1999); *see also Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 267–68,

112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). Therefore, my conclusion for purposes of the class certification motion that plaintiffs lack antitrust standing requires that defendants' motion to dismiss the RICO claims be granted.

### ORDER

IT IS ORDERED that

1. The motion of plaintiffs Loeb Industries, Inc., Los Angeles Scrap Iron & Metal Corp., and Metal Prep Company, Inc. for class certification is DENIED;

2. The motion of defendants Sumitomo Corporation and Global Minerals and Metals Corporation for leave to file objections to plaintiffs' supplemental memorandum in support of their motion for class certification is DENIED; and

3. The motion of defendants Sumitomo Corporation and Global Minerals and Metals Corporation to dismiss the amended complaint pursuant to Fed.R.Civ.P. 12(b)(6) is GRANTED.